### JERRY WAYNE MONTGOMERY *v.* STATE OF MARYLAND

[No. 562, September Term, 1971.]

*Decided March 23, 1972.*

8

The cause was argued before ORTH, MOYLAN and GIL-BERT, JJ.

*John F. Fader, II,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Donaldson C. Cole, Jr., State's Attorney for Cecil County,* and *John J. Lucas, Assistant State's Attorney for Cecil County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The verdict of the jury in the Circuit Court for Cecil County, returned on 22 April 1971, at the third trial of JERRY WAYNE MONTGOMERY for the felonious homicide of Richard Leroy Greene was guilty of murder in the first degree.[1] On 1 June 1971 the death penalty was

---

1. The history of the case began when the 17 year old Greene, who was employed at a gas station, was found by the manager of the station on the afternoon of 4 May 1965 on the floor of the station's office. There was a bullet hole in the back of Greene's head and he was dead. About $37 had been stolen from the safe. The Medical Examiner classified the death as homicide; the manner of death was a gunshot wound in the head. Montgomery and David Phillip Brown were indicted for the murder on 18 April 1966 by the grand jury for Baltimore County. The indictment survived two motions to dismiss it on the ground that a speedy trial had been denied, the first by both of the accused, see *Brown and Montgomery v. State,* 4 Md. App. 141, decided 26 April 1968, cert. den. as to Montgomery, 251 Md. 751, and the second by Brown alone, see *Brown v. State,* No. 412, September Term, 1968 filed 12 June 1969, unreported.

Brown was granted a severance and on 11 September 1969, upon trial before a jury in the Circuit Court for Baltimore County, was found guilty of murder in the first degree and on 19 March 1970 was sentenced to life imprisonment. The judgment was affirmed by this Court on 1 December 1970. *Brown v. State,* 10 Md. App. 462, cert. den., 1 March 1971, 261 Md. 722.

On 3 March 1970, upon suggestion, Montgomery's trial was ordered removed to the Circuit Court for Talbot County. He came to trial before a jury in that court on 18 May 1970 and on 21 May was found guilty of murder in the first degree. On 11 August 1970 upon a hearing on a motion for a new trial based upon newly discovered evidence, the court granted the motion. The docket entries under that date read: "Jury called to box to sit as they sat during the trial, all answered present. Jury sworn en banc as witnesses. Lois Johnson, Grace McQuay and Dora Pahlman to remain as witnesses—Other members of panel excused. Motion for a new trial

imposed with the proviso that if it were reduced to a lesser sentence, such lesser sentence was to run "consecutive to any sentence now being served by you for any other offense." On 8 June 1971 an appeal was noted to the Court of Appeals. Code, Art. 5, § 12.[2] On 2 December 1971 a panel of three judges appointed to review the sentence under Maryland Rule 762 c 2., ordered "that the sentence of death previously imposed upon Jerry Wayne Montgomery on June 1, 1971, be and it is hereby stricken." It further ordered "that it is the judgment and sentence of the Court that Jerry Wayne Montgomery as a punishment for his offense be and he is hereby committed to the jurisdiction of the Commissioner of Correction for the term of his natural life * * *."[3] See Rule 762 c 3 (c) and (d). And see also Code, Art. 26, §§ 132-138. By order of the Court of Appeals of 6 December 1971 the appeal was transferred to this Court to be docketed and decided or otherwise disposed of. See Code, Art. 5, § 5B.

## I

The prime point Montgomery makes in his attack on the judgment is that the sixth amendment right "to have the Assistance of Counsel for his defense" was denied him. It was not that he had no counsel representing him at the trial, nor was it that the counsel representing him was incompetent. It was that the case as conducted by the prosecution gave rise to an unusual circumstance, not only unexpected by the defense, but one which they could

---

is granted." On 24 September 1970 the Circuit Court for Talbot County ordered the case removed to the Circuit Court for Cecil County for trial.

On 18 January 1971 the trial of Montgomery began before a jury in the Circuit Court for Cecil County. On the third day of the trial the court declared a mistrial. The docket entries under date of 21 January 1971 read: "Jury retires: 2:17 P. M. Jury returns: 3:43 A. M. Jury could not agree. Court declared a mis-trial." The retrial resulting in the judgment before us now commenced on 20 April 1971.

2. Cf. Code, Art. 5, § 5A, added by ch. 99, § 2, Acts 1970, which by § 13 became effective 1 July 1970.

3. The order of the Review Panel said nothing about the sentence as changed running consecutively to any other sentence.

not reasonably have foreseen, which, according to Montgomery, resulted in his counsel not affording him a genuine and effective representation. The circumstance arose by the State calling David Phillip Brown, who had prior thereto been convicted of the first degree murder of Greene, see note 1, *supra,* as a witness in its behalf in rebuttal.[4] It seemed that he had not been called to testify at either of the two aborted trials of Montgomery. When the State called Brown, defense counsel, Phillip McKay Sutley, Esq., who, according to the transcript of the proceedings was the only attorney representing Montgomery at the trial, asked to approach the bench. He informed the court that he also represented Brown.[5] The transcript of the trial shows what transpired out of the presence of the jury.

> "MR SUTLEY [Defense Counsel]: I have been placed in a position now which I think almost necessitates my withdrawing from this case. I represent Brown. I don't think I could ever cross-examine him about this case. I don't know what he is going to testify to. But there is a recent Maryland case which was somewhat like this, and I feel that my effectiveness as counsel at this time would be limited and somebody else would have to get in here.
> THE COURT: I don't know why you say that, Mr. Sutley.
> MR. SUTLEY: Well, I represented Brown.
> MR. LUCAS [Assistant State's Attorney]: No conflict here.
> MR. SUTLEY: I think there is.

4. Under the discovery procedures available to Montgomery the State was required to furnish him a list of the names and addresses only of the witnesses it intended to call to prove its case in chief. Rule 728 a 3. An answer to Montgomery's demand for a list of witnesses to be so called, filed by the State on 18 June 1969, listed 48 names but that of Brown was not included.

5. It appears from the docket entries of the Circuit Court for Baltimore County in the record before us that Sutley was appointed to represent Brown on 6 June 1969 and to represent Montgomery on 3 February 1970.

12

MR. LUCAS: Where is the conflict? He is tried and convicted.

MR. SUTLEY: I represented him and there is a certain client and attorney privilege that I have between myself and Brown.

MR. LUCAS: That ended when the case was over.

MR. SUTLEY: I don't think so. This man still has an appeal pending.

MR. LUCAS: The appeal is confirmed.

MR. SUTLEY: In the United States District Court.

THE COURT: In the United States District Court?

MR. SUTLEY: I think it is. I feel I am put in a position right now when I can't be as effective as I could.

THE COURT: Why can't you, Mr. Sutley? Brown's case is over for all intents and purposes. You are not going to be in Brown's case any more.

MR. LUCAS: That is right.

THE COURT: Why is it that you can't effectively represent Mr. Montgomery? You have certainly done an outstanding job so far.

MR. SUTLEY: I don't know what Brown is going to testify to. I certainly have a good idea, but I don't know what he is going to testify to.

THE COURT: Well, if you are dealing in the realm of the unknown, why don't you wait until that becomes known before you make this proffer.

MR. SUTLEY: I mean I had information gathered from representing Brown which I don't think would be fair to Brown. I don't know what the status is. I think he has a petition in front of the Federal Court right now.

THE COURT: Wouldn't that be true all along? Wouldn't your representation be dual ab initio

if it is going to be dual when Brown takes the stand? Wouldn't it be conflicting from the start? You never felt this way before, did you?

MR. SUTLEY: Well, I never was really faced with this posture, I don't think. Why don't we see as we go along?

THE COURT: Why don't we wait and see, Mr. Sutley. If you have an objection, raise it, please. Wait a minute. Come back. I think it is only fair to ask your feelings in the matter, Mr. Montgomery. Are you willing for Mr. Sutley to go ahead and represent you or not?

THE DEFENDANT: I prefer having Mr. Sutley continue on the case, but if there is going to be some kind of conflict of interest wherein Mr. Sutley may possibly be endangered, I don't think that is advisable at all. As a matter of fact, defending a person as Mr. Sutley has done for both me and Brown is one thing, but defending me and then cross-examining against me would certainly be an exact opposite posture. And I don't know if he can effectively do that.

THE COURT: All right, thank you. Go ahead. We will see what happens."

What happened was that Brown, after stating that he was serving a life sentence imposed on 11 September 1969 upon conviction of murder in the first degree, testified that he had known Montgomery since 1960 or 1961 when he met him at the Hagerstown penal farm. He pointed out Montgomery in the courtroom. He said that on the day of the murder he left work about 11:40 a.m. and went to Montgomery's house at Montgomery's request. At the time Brown was working as a bench press operator at a printing plant and Montgomery did not have a job—"he had one but then he got fired." They went to several places, including a Sonny Surplus store where Brown bought a blank pistol, and then drove to North Point Boulevard in Baltimore County. The transcript reads:

14

"Q. What if anything did you do while you were on North Point Boulevard?
A. Stuck up a gas station.
Q. What type of a gas station was it?
A. It was one of them cheap ones, I don't know the name of it, either Scot or Sinclair or something like that.
Q. How many people were working in this gas station?
A. Just one.
Q. Was he a young man, an old man, boy?
A. About 17, 18.
Q. Had you ever seen that boy before?
A. No.
Q. All right. Who did what when you went into the gas station?
A. Well, I went in there to get some gas.
Q. Who was with you?
A. Jerry.
Q. All right. You went in to get gas. What did Jerry do?
A. He went to the bathroom.

BY THE COURT:

Q. What?
A. Went to the bathroom.

BY MR. LUCAS:

Q. And after he was in the bathroom what did you do?
A. I was drinking a soda when he come back out.
Q. When he came back out, Jerry came back out of the bathroom, where did you go?
A. He said this looked like a good spot to hit.
Q. And?
A. Well, I had the blank pistol in my pocket. I said, 'Okay.' So we were going to stick it up. I don't know where he got his gun.

Q. Oh, he had a gun?

A. Yes, he had a real one.

Q. When did you see it?

A. When he stuck up the kid.

Q. What did he say or do when he stuck up the kid?

A. He just told the boy it was a stickup.

Q. What did the boy say or do?

A. He started to get up out of the chair, and that is when the gun fired.

Q. Who fired the gun?

A. Jerry, he had it in his hand.

Q. Where did he shoot—did he shoot the boy?

A. Well, I don't think he intentionally shot him, but he did.

Q. He did shoot him?

A. Yes.

Q. Where did he shoot him?

A. Back here somewhere.

Q. Back of the head?

A. Yes.

Q. All right, now, after he shot the boy in the back of the head, what did he say or do?

A. The only thing he done was, after he grabbed the gun, picked the gun back up, then—

Q. Did he pick anything else up?

A. Yes, he picked the money up.

Q. Where was the money?

A. In the shirt pocket.

Q. And how was the money held together, if you recall?

A. A large paper clip.

Q. All right. So he took the money out of the boy's pocket while he was laying on the floor?

A. Yes.

Q. Then what did he say or do?

A. By that time I was gone. I was getting ready to get out of there.

Q. Did he get in the car with you?

A. He caught up with me."

After the incident they went to Glen Burnie and then "to a spot on Dorsey Road." Brown said the murder gun was thrown in Marley Creek. He asserted that no reward was offered him to testify, no one made any promises to him and gave him any inducements or threatened him. He had gotten in touch with the State's Attorney's office on his own accord and made known that he had evidence to offer in the case. He also testified about being in the Anne Arundel County Jail on 27 May 1965 where he met Montgomery. They were placed in the same cell. Montgomery told Brown: "Whatever you do, man, don't say nothing about the Dundalk job." Montgomery was "a little excited" when they were talking about the homicide. Brown remembered other inmates in the jail, among them Randall and Ryan. The cross-examination was limited in scope and substance:

"BY MR. SUTLEY:

Q. You said you were represented—you were tried in September 1969?
A. Yes.
Q. And do you recall who represented you?
A. Yes.
Q. Who was that?
A. You.
Q. And you have since appealed that case, is that right?
A. Right.
Q. Do you know the decision in that case, your appeal?
A. Affirmed.
Q. What?
A. Affirmed.
Q. What does that mean?
A. That means they stopped it.
Q. So your case is concluded?
A. Temporarily.
Q. You testified in your prior trial, is that right?
A. Yes.

Q. Did you tell a different story than you have told today?

A. Yes.

MR. SUTLEY: That is all I have."

On redirect the State asked if, in his trial, he had been "questioned as to who committed the murder in this case? Was it ever asked of you who committed the murder?" He replied: "I don't think so. But I am not sure." There was no recross-examination. The State rested. The defense offered no sur-rebuttal. Out of the hearing of the jury the court inquired whether the case should be argued that day or, because it was 3:10 P.M., to continue the trial the next morning. The State preferred the latter. The court asked Montgomery how he felt. The transcript reads:

"THE DEFENDANT: I think at this point I would prefer having someone else represent me here, because I am certainly not aware of what my rights are at this point. Since I haven't seen my counsel for quite a while, I am certain I don't know what procedures are proper here, what rights I have.

MR. LUCAS: If he has any questions as to procedure, your Honor, I think he ought to consult with Mr. Sutley.

THE DEFENDANT: I can't recognize Mr. Sutley any longer as my attorney.

MR. SUTLEY: I prefer to finish.

THE COURT: Finish tonight?

MR. SUTLEY: Yes."

After discussion, the court ruled that the case would be finished that day. The jury were instructed, counsel argued to them, and at 5:02 P.M. the jury retired to deliberate their verdict. The verdict was rendered at 9:40 P.M.

We first observe that the testimony of Brown was an important part of the State's case, and we can only con-

clude that there was a reasonable possibility that it might have contributed to the conviction. Montgomery had taken the stand and categorically denied any participation whatsoever in the robbery and murder of Greene.[6] Before Brown's rebuttal testimony, proof of Montgomery's criminal agency depended in the main on the testimony of a police officer who had been planted in the Anne Arundel County Jail and overheard a conversation between Brown and Montgomery indicating their involvement in the murder and on the testimony of several criminals who had been incarcerated in the jail and testified they overheard Montgomery talk in a similar vein. The case would turn on whether the jury believed the prosecution witnesses or the defense witnesses. This was clearly brought out in the closing arguments to the jury by both prosecution and defense counsel. The State

---

6. The transcript shows the following cross-examination of Montgomery by the Assistant State's Attorney:

"Q. Now, let's go back to the early part of that day [of the murder] Mr. Montgomery. Did you and David Brown go to the Dundalk area of Baltimore County?
A. No.
Q. Did you go into a Scotts Sinclair Station located on North Point Boulevard in Baltimore County on May 4, 1965?
A. No.
Q. Did you go into the men's room of a Scott Sinclair Station on North Point Boulevard in Baltimore County on May 4, 1965, while Brown stayed outside?
A. No.
Q. Do you go by this gas station in Brown's car and tell Brown that that station looked like an easy hit, and wait until the car goes by and we will go in and get it?
A. No.
Q. And did you not go into this gas station after the car pulled away with Brown, David Brown, and hold up this gas station that was being operated by Richard Leroy Greene, telling him that it was a holdup, and then shoot him in the back of his head?
A. No.
Q. And did you take thirty some dollars out of Richard Greene's pocket after you shot him in the head and leave the gas station with David Brown?
A. No.
Q. And did you leave the gas station with David Brown and head back towards the Lansdowne area crossing the Patapsco River on the Patapsco River Bridge and throw the gun and the paper clip from the money off the bridge?
A. No."

stressed Brown's testimony—"And then we have, most of all, Mr. Brown, his friend, and his companion, who was good enough to drive his car to the gas station and participate in the robbery and killing of Richard Greene." Defense counsel urged that Montgomery presented a clear picture of what had actually happened and asked the jury to look at the evidence contradicting him. He argued that Brown was the only witness who really did contradict Montgomery. The question was who was telling the truth. The State came back in its final argument: "So we have Mr. Brown. No eye witness to this murder and robbery? We had an eye witness, David Brown. He was the eye witness to this robbery and murder. He participated in it, from his own testimony. He was convicted of it and sentenced to life imprisonment. He was the eye witness that was there and told under oath that Montgomery pulled the trigger, the .22 caliber pistol, and shot and killed Richard Greene. There is our eye witness. But Montgomery denies all this." We think it plain that if defense counsel was improperly precluded from making an effective attempt to impeach Brown's credibility, it would not be harmless.

We next observe that although Sutley represented Brown at his trial on the charge that he murdered Greene, it appeared that at the time of Montgomery's trial Brown was no longer his client. The records of this Court reflect that Brown was represented by Thomas G. Bodie, Esq. on his direct appeal to this Court from the judgment entered on his conviction of murdering Greene. Bodie also represented Brown in his petition for certiorari to the Court of Appeals, see note 1 *supra*. And we think it obvious from Sutley's remarks at Montgomery's trial, see *supra,* that he did not represent Brown in whatever proceedings were pending in the federal courts. Thus no conflict of interest arose, as it often does, from the simultaneous representation of two persons by one attorney.

If there was a conflict of interest here it arose because of a lawyer's obligation to hold inviolate the confidences and secrets of his client. See *Code of Professional Respon-*

*sibility,* Canon 4, Ethical Considerations EC 4-1 to EC 4-6, inclusive; Disciplinary Rules, DR 4-101; Maryland Rule 1230.[7] "Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him."[8] EC 4-1. "A lawyer must always be sensitive to the rights and wishes of his client and act scrupulously in the making of decisions which may involve the disclosure of information obtained in his professional relationship." EC 4-2. "The obligation of a lawyer to preserve the confidences of his client continues after the termination of his employment," and even following the termination of the practice of the lawyer. EC 4-6. But a lawyer may reveal confidences or secrets with the consent of the client after a full disclosure of them. DR 4-101 (c) (1).

Considering the substance of Brown's testimony and the free and voluntary manner in which he said he came to testify, we find a release by him to Sutley of any obligation Sutley may have had not to reveal confidences and secrets regarding the murder of Greene. In other words, we think that Brown consented implicitly within the contemplation of DR 4-101 (c) (1) to the revelation by Sutley of such confidences and secrets. The record does not show what confidences and secrets were imparted to Sutley by Brown during their professional relationship but Brown's testimony at Montgomery's trial may be con-

---

7. The Committee note to Rule 1230, adopting the Code of Professional Responsibility of the American Bar Association explains: "The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations. The Disciplinary Rules unlike the Ethical Considerations are mandatory in character. They state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."

8. " 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Disciplinary Rules, DR 4-101 (a).

sidered in two lights. Either it was the same in substance as that which he told Sutley or it was contrary to what he told Sutley. If it was the same, then what he told Sutley ceased to be a confidence or a secret because Brown himself voluntarily disclosed it publicly. Thereafter Sutley was under no obligation to preserve what was no longer confidential and secret. If it was contrary to what he had told Sutley, then Brown either lied to Sutley or his testimony at the trial was perjured. If he lied to Sutley then he could not expect his testimony to be accepted with no reference to his prior inconsistent statements and we believe that Sutley, in the interest of justice, could properly make inquiry of him. If his testimony was perjured "The Law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline." *Code of Professional Responsibility,* Canon 7, EC 7-26. "Because it interferes with the proper administration of justice, a lawyer should not suppress evidence that he or his client has a legal obligation to reveal or produce." EC 7-27. See DR 7-102 (A) (3) and (6). Further, DR 7-102 (b) provides: "A lawyer who receives information clearly establishing that: (1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal. (2) A person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal." The short of it is that we feel that in the circumstances there was no conflict of interest such as to preclude a full cross-examination of Brown by Sutley. However, this conclusion does not end our inquiry. "The issue of conflict of interests is substantially subsumed by the more critical consideration of effectiveness of counsel; once the latter is shown to have been denied, a prolusion that the former was its cause would seem to be mere academic surplusage." Note, *Conflict of In-*

*terests in Criminal Proceedings,* 23 Arkansas Law Review 250, 251 (1969). The question is, therefore, does the record here show that effectiveness of counsel was denied Montgomery.

When Sutley made known his views upon Brown being called by the State, he said he did not know what Brown's testimony would be but he "certainly had a good idea." The discussion concluded with Sutley saying: "Well, I never was really faced with this posture, I don't think. Why don't we see as we go along?" The court agreed: "Why don't we wait and see Mr. Sutley. If you have an objection, raise it, please." Montgomery said he did not know if Sutley could effectively cross-examine Brown. The examination of Brown then proceeded. Sutley raised no further objection. As Sutley waited and heard Brown's testimony without making further objection, we can only conclude that Sutley was satisfied that his fears voiced when Brown was first called by the State proved unwarranted in the light of the actual testimony given. From the record he was content to proceed with the case as Montgomery's attorney, making no further suggestion that his appearance be stricken. Nor did he move for a mistrial or challenge the proceedings on this issue in any other way. It is true that at the close of Brown's testimony Montgomery told the court he preferred having someone else represent him and said he could not recognize Sutley as his attorney any longer but he was in no position to judge fairly because it did not appear that he had any knowledge of what Brown had told Sutley. See *Davenport v. State,* 7 Md. App. 89; *King v. State,* 5 Md. App. 652. "It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant." EC 4-1. Viewed in this frame of reference, we think that the limited scope of the cross-examination of Brown may be deemed a trial tactic and perhaps not an unwise one. He elicited that Brown told a different story at his own trial than he told in Montgomery's trial. We cannot say that Sutley did not feel it was better not to take the chance of

Brown remaining steadfast in the face of a vigorous and probing cross-examination, for if he did, such examination could only serve to emphasize and reinforce Brown's story in the eyes of the jury, and tend to strengthen rather than impeach his credibility. Brown had admitted giving a different version under oath before, giving Sutley the opportunity to argue to the jury, as he did, that Brown was simply not worthy of belief. But even a trial tactic which in retrospect appears to have been erroneous does not compel a conclusion that counsel was inadequate. *Hall v. Warden,* 224 Md. 662, 665; *Gullion v. Warden,* 3 Md. App. 263, 266. See *Henry v. Mississippi,* 379 U. S. 443. We hold that Montgomery was not denied his right to effective assistance of counsel. Compare *Kent v. State,* 11 Md. App. 293; *Brown v. State,* 10 Md. App. 215.

## II

On 27 May 1965 in the Annapolis Jail, Armond T. Elliott of the Baltimore County Police Department overheard a conversation between Montgomery and Brown which tended to establish their participation in the murder of Greene. The matter of the admissibility of Elliott's testimony regarding the conversation was heard out of the presence of the jury. The prelude to this activity by Elliott was shown by a stipulation [9] read into evidence by defense counsel:

> "May it please your Honors, after much work the State and defense have reached the point where we have a stipulation to offer to the Court, beginning with the receipt of a teletype to the Baltimore County Police Bureau, informing the Baltimore County Police that they had two subjects in the Anne Arundel County Jail in Annapolis, on an armed robbery charge, and that the description was similar to that that the Baltimore County Police had prepared from an

---

9. The stipulation had been worked out in the previous trial in Talbot County and read into evidence there by the State.

24

identokit during the investigation of this homicide that occurred on May 4th in Baltimore County.

With this teletype, Lieutenant James Pierce, who is head of the Squad who is now considered the Major Crime Squad, assigned Sergeant Roemer to go to the Annapolis Police Jail to interview these two suspects. After a brief interview and return to Baltimore County Headquarters Sergeant Roemer reported to Lieutenant Pierce that in his opinion and from observing the two suspects, that one of the suspects matched the description of the suspect prepared in the identokit in relation to the homicide on May 4th.

With this information Lieutenant Pierce set a plan into action whereby he assigned Detective Sergeant Paul Hardesty along with Detective Tunney to the Annapolis Jail, as prearranged with Warden Bonar and Lieutenant Paley.

Sergeant Hardesty and Detective Tunney were committed to the Annapolis Jail on May 26, at approximately 3 P.M. They were placed in the cell with instructions from Lieutenant Pierce to obtain whatever information they could in reference to this homicide of May 4th in Baltimore County. The only additional information or instructions they were given were the names of these two suspects, one being the defendant, Montgomery, and the other defendant, Brown.

Sergeant Hardesty and Detective Tunney remained at the Annapolis Jail, well, let's start with Tunney. Tunney was removed from the jail the first evening. Sergeant Hardesty remained two days. The following day on the 27th Lieutenant Roemer withdrew Sergeant Hardesty and the replacement officer, Tunney, he assigned Corporal Armond Elliott to go to the

jail. He was committed on the 27th with the same instructions, to obtain whatever information he could concerning the homicide on May 4, 1965 in Baltimore County. Corporal Elliott remained in the jail until the 28th.

Now, Lieutenant Pierce also conceived a plan, I will have to go back to the 26th. Sergeant Hardesty, along with Detective Tunney, had overheard an admission by the defendant and co-defendant, Brown, as to their participation in this homicide in Baltimore County on May 4, 1965. Corporal Elliott along with Detective Tunney also heard admissions by the defendant and his co-defendant as to their participation in the homicide in Baltimore County. * * *

With this Lieutenant Pierce set up a line-up in Baltimore County Police Headquarters where the defendant and co-defendant were placed in the line-up. This line-up was held for the purpose, the first purpose was to see whether or not an identity could be obtained in reference to an armed robbery committed in Baltimore County of a bake shop. * * *

The line-up was held in the Annapolis Jail and the lineup was viewed by the woman that was operating the bakery at the time of the holdup. She had made a positive identification. Once this lady left the line-up Lieutenant Pierce, on a prearranged plan, sent in Detective Sergeant John Cox. Sergeant Cox was sent in there for the sole purpose to stimulate conversation between the defendant, Montgomery, and the co-defendant Brown. Sergeant Cox walked into the line-up room. The subjects in the line-up were given an opportunity to change their positions wherever they wished. Sergeant Cox walked in, merely pointed to the defendant Montgomery and to the co-defendant Brown, and without any word or comment left the viewing room.

> Well, this produced the conversation that they had anticipated and the defendant Montgomery and Brown were taken back to their respective cells, whereupon Corporal Elliott again overheard conversations between the defendant * * * and the co-defendant as to their participation in the homicide of May 4, 1965."

Montgomery gave the court his version of what occurred. On 21 May 1965 he was questioned about Greene's murder by Corporal Roemer and Officer Ruth. On 27 May in the Annapolis Jail he had a conversation with a man he thought was a fellow prisoner but who in fact was Officer William Turner who asked Montgomery what he was in for and how much time he was doing. Montgomery testified: "Of course I mentioned the fact that I had just been recently interrogated about this murder charge, that I had been interrogated by Officer Ruth and Officer Roemer, and he said, 'Do you think there is anything serious in this?' and I said, 'No, I don't see how there can be, I don't know anything at all about it.' He said, 'Well, if they really get you up tight, which means kind of if they have a good case against you or something, you can always plead insanity. Most people get off that way very easily.' I said, 'Well, I don't plan on doing that, because I am innocent and I believe in the justice of the courts, and I think that justice ultimately will prevail.'" Later that afternoon Brown came into the cell block. Elliott, posing as a prisoner named Saunders, was with Brown and they were talking. Montgomery recounted what happened:

> "So I automatically thought, well, if my co-defendant knows him, is talking to him, the guy must be okay.
>
> So as soon as he entered the area I jumped up and ran toward my co-defendant, because we had been separated during this period of time, and threw my arms around him, said, 'Gee, what are we doing down here?' And no sooner had I

said that than this person Elliott said to Brown, my co-defendant, 'Is this the one you were talking about?' And Brown said, 'Yes, this is my co-defendant.'

So then this Officer Elliott asked me, he said, 'Boy, you are in pretty deep trouble, aren't you?' I said, 'No, sir. How do you get that?'

He said, 'Well, Brown was just telling me that you had been questioned on a homicide, and you are also waiting to be tried on kidnapping and some robberies. Seems you are in pretty bad trouble.'

I said, 'No, I don't know where you got your information, but if Brown told you that it is kind of mixed up.'

So this fellow Elliott wanted to kind of, you know, keep on talking. I wanted to get away from him and, you know, talk to my co-defendant. After all, this is the guy, we lived together, slept together, worked together, and I wanted to get alone with him in a cell and kind of talk things over and try to get our case together, which was a pretty serious matter. But this guy Elliott kept tagging along.

As we went into the cell he came right up to the cell door, stuck his head in, which is generally something you don't do in a prison or a jail area. And when he stuck his head in the door he said, trying to continue the conversation that he had originally began, 'Well, look, if you do have these charges, you know, maybe if you talk to somebody from the Police Department, man, maybe you can make some arrangements, some kind of a deal.'

Of course, being young and naive, I didn't think the courts operated that way, so I said, 'No, no use talking about it.' And eventually he kind of backed off, backed away from me, from

the cell door a little bit, and Brown and I did have a chance to talk.

But later on during the same day this fellow Elliott kept trying to get me in the conversations, kept asking me what am I in for, how much time do you think you will get, and why don't you try and contact somebody from the Police Department, maybe they can help you. Why don't you try pleading insanity? The whole thing.

This in essence is what occurred while we were on the tier together. And later on when they moved all of us off the tier, they put myself, Brown and this officer in a secluded area just next to the Warden's office, and again this Officer Elliott continued the conversation, still under the impression that he is an inmate. And again he continued the conversation asking me questions, trying to kind of probe into the thing. This turned me off right away. Because people who are too nosey about other people's business, there has to be some ulterior motive. Now, I did not suspect him as a police officer, but I did suspect that he was just a bit too nosey."

Elliott gave the court his version of what happened. "I was taken to the Ferndale Police Station, processed, handcuffed, and then taken to Annapolis Jail along with four or five other prisoners." His orders were "just listen to anything I could hear in regards to an offense." He was given a description of the two men he was to listen to but not their names. Nor was he told anything about the offense in which his superiors were interested. He was nearby when Brown and Montgomery met in the jail. He had no conversation with them; he did not interrogate them; no other police officer at the time talked to them. When Montgomery and Brown talked, Elliott simply listened. He did talk to them later that evening, but this was several hours after the conversa-

tion between Brown and Montgomery about which Elliott testified.

Turner testified he was in the Annapolis Jail in the guise of a prisoner on 27 May 1965. About 5:13 P.M. he went in a cell block where Montgomery was playing cards with other prisoners. A short time later Turner joined the game. "We were talking about what we were in for, and I told them I was in for breaking and entering." About an hour later the guards came and changed prisoners around. Brown was brought into the cell block and Elliott was brought in at that time also. "Brown and Montgomery immediately took up company in Montgomery's cell." Turner continued to play cards. To that point he had no direct conversation with Montgomery other than saying to him and to the other inmates that he was in for breaking and entering.

The lower court held that the conversation overheard by Elliott was admissible. We had considered the admissibility of the conversation in *Brown v. State,* 10 Md. App. 462. We found, 469-474, that there was no compulsion involved so as to violate the fifth amendment clause against self-incrimination, that there was no unreasonable search and seizure in derogation of the fourth amendment guarantee, and that there was no invasion of the right of privacy so as to deny due process of law. But Montgomery urges that the principles of *Miranda v. Arizona,* 384 U. S. 436 apply to bar the admission of the challenged evidence. In making its ruling the lower court found as a fact that Elliott and Turner did not question Montgomery prior to the time the conversation ensued between Montgomery and Brown. Montgomery recognizes that the credibility of the witnesses was for the trial court. Thus, as far as those two police officers were concerned, there was no custodial interrogation within the contemplation of *Miranda* and its exclusionary rules were not invoked to bar the challenged conversation. But, Montgomery argues, the inculpatory statements he and Brown made were "stimulated" by the line-up held some 21 hours before when Sergeant Cox simply pointed to

Montgomery and Brown. The lower court found that this was not within the contemplation of *Miranda* and we agree. Even if the line-up tactic be deemed to have primed the pump it did not force the flow. The *Miranda* holding was that "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U. S. at 444. The statements here challenged simply did not stem from a custodial interrogation of Montgomery. *Miranda* spelled out the meaning of "custodial interrogation": "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Ibid. Of course, Montgomery was in custody within the meaning of *Miranda* but he was not "questioned" within its contemplation. As was said in *Miranda*: "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." Id., at 478. And we observe it was made clear in *Miranda* that "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Ibid. We do not believe that the line-up procedure of which Montgomery now complains was the type of "compelling influence" *Miranda* intended to prevent.

We conclude that in the circumstances the challenged evidence could properly be used by the prosecution without demonstrating the use of *Miranda's* procedural safeguards. We hold that the lower court did not err in admitting it.

*Judgment affirmed.*