ANDRESEN *v.* BAR ASSOCIATION OF
MONTGOMERY COUNTY,
MARYLAND

[No. 336, September Term, 1972.]

*Decided June 12, 1973.*

314

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*David B. Lamb,* with whom was *Peter C. Andresen* on the brief, for appellant.

*James T. Wharton* for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Maryland Code (1957, 1966 Repl. Vol., 1971 Cum. Supp.), Article 21, § 42 (recodified as Article 21, § 7-106 in the 1973 Repl. Vol.), authorizes any duly organized bar association of this State to petition a court of equity "to order an audit to be made of the accounts maintained . . . for funds received in connection with real estate closing transactions in this State" by persons responsible for disbursing funds in connection with the conveyancing of title to real estate where such persons fail to provide the buyer and seller, under certain circumstances and within a designated time, with specified documents evidencing the existence of recorded releases of mortgages or deeds of trust.[1]

---

1. § 42 (Chapter 726 of the Acts of 1968) provides:

"(a) *Duty of person responsible for disbursement of funds in real estate conveyance.* — When a person has undertaken responsibility for the disbursement of funds in connection with the conveyance of title to real property, it shall be the duty of such person to furnish to the seller and buyer in the transaction, the original or a photographic, photostatic or similarly reproduced copy of the recorded release of any mortgage or deed of trust which such person was obliged to obtain and record with all or part of the funds to be disbursed or, if such original or copy of a recorded release is not readily obtainable at the time of recording, it shall be sufficient to furnish the buyer or seller the original or a copy of the court's recordation receipt for such release or other certified court document clearly evidencing the recordation of such release.

"(b) *Time of delivery of evidence.* — The required evidence of a recorded release shall be mailed or otherwise delivered to the seller and buyer within thirty days from the delivery of the deed or deeds conveying title to the real property, except that if the recording of the release will be delayed beyond the thirty-day period for causes not attributable to the neglect, omission or malfeasance of the person responsible for the disbursement of funds, a letter explaining the delay shall be mailed or otherwise delivered to the seller and buyer within the thirty-day period, and such person shall furnish to the seller and buyer the required evidence of the recorded release at the earliest opportunity thereafter, provided that the person shall follow the procedure of mailing or otherwise delivering a letter of explanation each thirty days until the required evidence of a recorded release is furnished to the buyer and seller.

"(c) *Noncompliance with subsections (a) and (b).* — If the provisions of

**316**

On November 6, 1972 the Bar Association of Montgomery County, pursuant to the provisions of § 42, filed a petition in the Circuit Court for Montgomery County to obtain an audit of the accounts maintained by Peter C. Andresen, a member of the Maryland Bar, "for funds received in connection with real estate closing transactions in the State of Maryland." The petition alleged that the State's Attorney of Montgomery County had charged Andresen on November 1, 1972, by a criminal information, with four counts of false pretenses (as shown by a copy of the information attached to the petition); that "additional facts" had been made available to the Bar Association by the State's Attorney "which strongly suggest circumstances warranting the granting of a special audit upon . . . [Andresen's] escrow fund accounts"; that the Bar Association had been informed by the State's Attorney that releases of deeds of trust "appear to have been made tardily or not at all" by Andresen who acted as settlement attorney for the sale of properties from the Clark-King Construction Company (Clark-King) to enumerated homeowners in the Potomac Woods Subdivision (the Subdivision) of Montgomery County; that the transactions in question involving unreleased deeds of trust

---

subsections (a) and (b) are not complied with by the person responsible for the disbursement of funds, the seller, buyer or a duly organized bar association of this State, may petition a court of equity to order an audit to be made of the accounts maintained by such person for funds received in connection with real estate closing transactions in this State. The petition shall state concisely the facts showing such noncompliance and shall be verified. The court shall upon receipt of such petition issue an order to the person to show cause within ten days why such audit should not be conducted. If such cause is not shown, the court may order the audit to be conducted. The court may order such other relief as it deems appropriate under the circumstances of the case.

"(d) *Seller and buyer to be informed of provisions of section.* — Prior to the execution of the deed or deeds conveying title to the real property, the person responsible for the disbursement of funds shall inform the seller and buyer in writing of the provisions of this section.

"(e) *Effect of proper disbursement of funds within five days.* — Unless specifically requested to do so by either the buyer or the seller, a person responsible for the disbursement of funds in a real estate closing transaction shall not be required to provide such buyer or seller with the required evidence of a recorded release if such person properly disburses all funds entrusted to him in the course of the closing transaction within five (5) days from the date of the delivery of the deed or deeds conveying title to the real property.

\* \* \* "

pertained to lots 12(T), 13(T), 14(S), 15(S) and 25(R) of the Subdivision; and that the State's Attorney's investigation disclosed that many of the purchasers of properties in the Subdivision "knew nothing of the named unreleased mortgages until the subject was revealed . . . to them [by the State's Attorney]."

Responding to the court's order to show cause why the audit should not be conducted, Andresen answered that he had not failed to comply with the requirements of § 42 because all the funds coming into his possession in connection with the transactions either "were disbursed within five days after settlement, the parties waived receipt of the releases, or that the parties were notified pursuant to § 42(b)." In addition, Andresen entered a general denial that sufficient ground existed to conduct a special audit under § 42.

At the hearing on the petition, the Bar Association adduced evidence showing that on December 13, 1969, the F. O. Day Company (Day) took a deed of trust from Clark-King, developers of the Subdivision, as security for payment of a note; that the deed of trust, securing a $37,000 debt owed Day by Clark-King, covered sixteen or seventeen lots in the Subdivision and contained a clause authorizing the trustees, Andresen and William Wheeler (Day's attorney) to release each lot upon payment to the noteholder of $2,000 per lot; that no payments on account of the note were made until October 7, 1970 when $9,000 obtained by Clark-King in connection with settlement upon one of its properties located outside the Subdivision was paid to Day. There was evidence showing that settlement was held on a number of properties purchased within the Subdivision between 1970 and 1972; that Andresen acted as settlement attorney in these transactions; that the outstanding deed of trust held by Day covering the lots in the Subdivision was not disclosed by Andresen at the time of settlement and no release of many of the properties covered by the deed of trust was recorded until many months after the deeds were delivered. Testimony given by the purchasers of lots 25(R) and 7(T) in the Subdivision was to the effect that deeds for

these properties were recorded in July of 1970, but they were not furnished copies of recorded releases of the deed of trust covering their lots until two years later in July and August of 1972 when the lots were released from the operation and effect of the deed of trust after demand was made upon Andresen that he provide each of them with a copy of the recorded release. In neither case were the property owners notified of any reason for the delay in releasing the deeds of trust.

Considerable evidence produced by the Bar Association to prove that Andresen, as settlement attorney, failed to comply with the requirements of § 42 (a) and (b) pertained to properties in the Subdivision which were not specifically alluded to in the petition. Andresen's objections to the introduction of such evidence were summarily overruled by the trial court.

There was evidence showing that at the time of settlement on lots 25(R) and 7(T), the property owners, after being advised by Andresen of the provisions of § 42, signed the following written waiver:

> "We hereby waive being furnished evidence of recorded releases; having been assured by said settlement attorney that all funds in this transaction will have been disbursed within 5 days from the date of delivery of the deed."

Andresen did not testify at the hearing and offered no evidence on his own behalf.

The lower court found that the evidence disclosed "many transactions where there was a deed recorded, and a release was not of record until in some instances more than two years thereafter." The court concluded that "the presumption is . . . that the money was received but it was not disbursed." Believing that the waivers signed by the owners of lots 25(R) and 7(T) did not constitute compliance with the requirements of § 42, and that the evidence otherwise showed that Andresen had not complied with the provisions of the statute, the court ordered that a special audit be conducted (by an independent auditor) "of the accounts

maintained by ... Andresen ... for funds received in connection with real estate closing transactions in the State of Maryland." The order directed that the audit be submitted to the court and that upon receipt, the court would notify counsel for the parties and thereafter would pass "a further order in these proceedings, particularly with reference to the use of said audit." The court's order enjoined Andresen from secreting or taking from Montgomery County any of the accounts to be audited, "or any of his account books, check book ledgers, statements of account, checks, stubs or files employed in connection therewith until further Order of this Court."

Andresen claims on appeal, as he did below, that his Fifth Amendment right against compulsory self-incrimination, applicable to the states through the Fourteenth Amendment, *Malloy v. Hogan,* 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964), would be violated if he were compelled to submit his accounts to the special audit ordered by the court. He alleges that the information gleaned from the audit, if made, will be used in connection with the criminal proceedings pending against him instituted by the State's Attorney, and the disbarment or disciplinary proceedings previously initiated against him by the Bar Association. Other allegations raised by Andresen on appeal are (1) that the lower court erred in admitting into evidence and considering testimony and exhibits regarding matters not included or referred to in the pleadings; (2) that prejudicial error was committed by the court when it considered the testimony of the Bar Association's investigating attorney to be that of an expert in real estate transactions; (3) that the court was in error in disregarding the written waivers executed by the property owners of their right under § 42 to be furnished with evidence of recorded releases; (4) that the evidence was legally insufficient to support the court's order, particularly since no evidence was offered by the Bar Association to show that funds coming into Andresen's possession were not disbursed within five days from the date of delivery of the deeds, thus obviating the need to provide the buyer and seller with evidence of recorded releases; (5)

that § 42 was so vague and indefinite as to constitute a violation of the due process clause of the Fourteenth Amendment; (6) that a compulsory production of Andresen's accounts would constitute an unreasonable seizure in violation of the Fourth Amendment to the federal constitution.

I

As heretofore indicated, § 42 (a) and (b) impose a duty upon attorneys assuming responsibility for disbursing funds in connection with the conveyance of title to real estate to provide the seller and buyer, within thirty days from the delivery of the deed (unless an extension of that period is warranted and becomes operative by reason of notice given to the parties), with documentary evidence of recorded releases of mortgages or deeds of trust. Under the provisions of § 42 (c) failure to comply with these requirements may result in a petition being filed by the seller, buyer, or a bar association seeking an audit of the attorney's "accounts maintained ... for funds received in connection with real estate closing transactions in this State." Any such petition is required to "state concisely the facts showing such noncompliance and shall be verified." § 42 (c). By the provisions of § 42 (e) a settlement attorney is not required to provide evidence of recorded releases to the seller and buyer if he "properly disburses all funds entrusted to him in the course of the closing transaction within five (5) days from the date of the delivery of the deed or deeds conveying title to the real property."

We think it readily evident that § 42 was designed to protect the parties in transactions involving the conveyance of title to real estate from careless or fraudulent practices by persons having responsibility for disbursing the funds received in connection with the conveyance. The grant of authority to a duly organized bar association to petition the court for the audit permitted under § 42 (c) plainly reflects the Legislature's recognition that members of the Bar frequently assume the responsibility of disbursing funds in such transactions, and that it is in the general public

interest, and in the special interest of the legal profession, that a bar association be authorized to assert noncompliance with the provisions of § 42.

We are satisfied that the lower court could properly conclude, as it did, that an audit of Andresen's real estate accounts was essential because of the evidence showing his failure to comply with the positive requirements of § 42 (a) and (b).

The evidence adduced in connection with four of the five transactions specifically referred to in the Bar Association's petition showed that Andresen did not provide the requisite evidence manifesting release of the Day deed of trust within thirty days of the delivery of the deeds to the properties. That he did not properly disburse the settlement proceeds coming into his hands in connection with these transactions within five days from the delivery of the deeds in accordance with § 42 (e) is evidenced by the fact that Day's deed of trust was not released until months after the deeds had been delivered. But even if Andresen had disbursed within the five day period under § 42 (e), that fact alone would not necessarily insulate him from audit under § 42 (c); compliance with § 42 (e) grants relief only from the duty to provide evidence of recorded releases.

In the circumstances of this case, we do not think the admission of evidence involving transactions not mentioned in the Bar Association's petition constituted error prejudicial to Andresen's defense; the evidence — (except for one property) all relating to properties within the Subdivision — was essentially cumulative. Nor do we think that the waivers executed by the owners of lots 25(R) and 7(T) relieved Andresen of his obligation to provide them with evidence of the recorded releases; the waivers were plainly predicated upon disbursement being made by Andresen within five days from the date of delivery of the deeds, a condition not met.[2] And we find no error in the

---

2. Whether, in view of the requirements of § 42, a waiver of the right to receive recorded releases would be valid, if unconditional, is a question we do not reach in this appeal.

court's treatment of the alleged expert witness; his testimony was basically limited to reciting the details of his investigation into the land records of Montgomery County. The only opinion testimony given by him was elicited by Andresen on cross-examination, and it does not clearly appear that the lower court considered it as the testimony of an expert witness.

Since Andresen did not challenge the constitutionality of § 42 in the lower court on the ground that it was unconstitutionally vague and indefinite, nor there raise any question with respect to his Fourth Amendment right not to be subjected to illegal seizures, these constitutional issues have not been preserved for appellate review, and we do not pass upon them. *Schiller v. Lefkowitz*, 242 Md. 461, 219 A. 2d 378 (1966); *Hewitt v. State*, 242 Md. 111, 218 A. 2d 19 (1966); Maryland Rule 885.

## II.

The key issue on appeal, and one which was preserved in the lower court, is the relationship of the constitutional protection against compulsory self-incrimination to the ordered audit of Andresen's real estate accounts. Andresen claims protection under the Fifth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment by *Malloy v. Hogan, supra,* and under Article 22 of the Maryland Declaration of Rights, which we have construed to be in *pari materia* with the Fifth Amendment, *Blum v. State*, 94 Md. 375, 51 A. 26 (1902), and subject to a like construction, *State v. Panagoulis*, 253 Md. 699, 253 A. 2d 877 (1969). It is well established that these constitutional provisions are available in civil as well as criminal proceedings, *United States v. Kordel*, 397 U. S. 1, 7-8, 90 S. Ct. 763, 767, 25 L. Ed. 2d 1, 8 (1970) and cases cited therein at n. 10, to protect both oral testimony and private documentary evidence of a testimonial nature, *United States v. White*, 322 U. S. 694, 64 S. Ct. 1248, 88 L. Ed. 1542 (1944), *Boyd v. United States*, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), *Archer v. State*, 145 Md. 128, 125 A. 744 (1924), *Blum v. State, supra,* which present the claimant with

substantial hazards of self-incrimination, *California v. Byers*, 402 U. S. 424, 91 S. Ct. 1535, 29 L. Ed. 2d 9 (1971), *Malloy v. Hogan, supra, Midgett v. State*, 223 Md. 282, 164 A. 2d 526 (1960).

Andresen relies on the Supreme Court's holding in *Boyd, supra*, a vintage case of continued vitality (*see Couch v. United States*, 409 U. S. 322, 93 S. Ct. 611, 34 L. Ed. 2d 548 (1973)); that case held that the private records and books of an individual are protected by the privilege against self-incrimination. The Bar Association claims that *Shapiro v. United States*, 335 U. S. 1, 68 S. Ct. 1375, 92 L. Ed. 1787 (1948), and not *Boyd*, is the controlling authority; *Shapiro* held that records required to be kept by law are "public records" outside the scope of the Fifth Amendment protection. Both parties cite *Spevack v. Klein*, 385 U. S. 511, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967), which held that a lawyer could not be disbarred for refusal, on Fifth Amendment grounds, to produce his financial records subpoenaed to a judicial inquiry into professional misconduct. *Spevack* is not dispositive of the present controversy, however, for the Supreme Court there expressly refused to consider the applicability of *Shapiro* as the doctrine espoused in that case had not been timely raised below; nor has any subsequent case squarely answered the question.[3]

In *Shapiro* the court concluded that records and documents — sales invoices, sales books, ledgers, inventory records, contracts and sales records — required to be kept by valid regulations of the Office of Price Administration could be subpoenaed by the Price Administrator without violating Shapiro's right against self-incrimination. The Court reasoned, consistent with the principle announced in *Wilson v. United States*, 221 U. S. 361, 31 S. Ct. 538, 55 L. Ed. 771 (1911), and followed in *Davis v. United States*, 328 U. S. 582, 66 S. Ct. 1256, 90 L. Ed. 1453 (1946), and numerous state

---

**3.** The commentators have generally taken the position urged by the Bar Association, *see, e.g.,* Niles and Kaye, "Spevack v. Klein: Milestone or Millstone in Bar Discipline?", 53 ABA Journal 1121 (1967).

court decisions which it cited in n. 25, 335 U. S. at 18, 68 S. Ct. at 1385, 92 L. Ed. at 1799, that

> " ' *records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established* . . . .' " 335 U. S. at 17, 68 S. Ct. at 1392, 92 L. Ed. at 1799
> (emphasis in original.)

are analogous to public documents in public offices to which the privilege against self-incrimination does not attach. The Court distinguished *Boyd, supra,* as extending the protection only to private papers voluntarily maintained, 335 U. S. at 33, 68 S. Ct. at 1392, 92 L. Ed. at 1807-08 n. 42.
Recognizing that

> ". . .there are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself. . . ." 335 U. S. at 32, 68 S. Ct. at 1391-92, 92 L. Ed. at 1807

the Court found the facts in *Shapiro* to be within those limits.

Subsequent cases have identified at least three essential elements of the required records doctrine: (1) the records required to be kept are of the same kind customarily kept by a person engaged in such activity; (2) the records have "public aspects" beyond the mere fact that the Government desires the information and has formalized its demand by statute, rule, or regulation; (3) the records relate to an essentially non-criminal and regulatory area of inquiry. *Marchetti v. United States,* 390 U. S. 39, 56-57, 88 S. Ct. 697, 707, 19 L. Ed. 2d 889, 902-03 (1968), *Grosso v. United States,* 390 U. S. 62, 67-68, 88 S. Ct. 709, 713-14, 19 L. Ed. 2d 906, 913 (1968).

The required records doctrine has been applied in numerous and various circumstances; we review only a few

illustrative cases. In *Hodgson v. Mahoney*, 460 F. 2d 326 (1st Cir. 1972), the Secretary of Labor, in the process of seeking to enjoin violations of the Fair Labor Standards Act, obtained a court order directing the defendant-employer to either answer propounded interrogatories or permit the Secretary to examine his payroll records to obtain the information sought by the interrogatories. The Court approved the order, finding, ". . . the payroll records sought are required to be kept and preserved in order to effectuate governmental regulation . . . . Consequently they have 'public aspects' and do not invoke the protection of the fifth amendment." 460 F. 2d at 328. In *United States v. Warren*, 453 F. 2d 738 (2d Cir. 1972), a doctor convicted of unlawful distribution of drugs claimed violation of his right against self-incrimination in the seizure and admission into evidence of his records (index cards with patient names and notations of number of injections given, the dates and charges for them). The Court, finding no constitutional violation, distinguished the case from *Hill v. Philpott*, 445 F. 2d 144 (7th Cir. 1971), which relied upon the holding of *Boyd, supra.* The Court said:

"Hill v. Philpott. . .held that business records seized by an Internal Revenue agent could not be used without violation of the defendant's Fifth Amendment rights. In that case, however, the records were personal business items; in this case, Dr. Warren was required under 21 U.S.C. § 360a(d) to make and keep records on acquisition and disposition of amphetamine. Such records, part of a regulatory scheme with public purposes, are not protected by the Fifth Amendment and are specifically excluded from the holding in *Hill.* 445 F. 2d at 146. United States v. Kaufman, 429 F. 2d 240, 247 (2d Cir.), cert. denied, 400 U. S. 925, 91 S. Ct. 185, 27 L. Ed. 2d 184 (1970); Shapiro v. United States, 335 U. S. 1, 68 S. Ct. 1375, 92 L. Ed. 1787 (1948)." 453 F. 2d at 742.

In *Fairbank v. Hardin*, 429 F. 2d 264 (9th Cir. 1970), the

Secretary of Agriculture, through administrative proceedings, suspended the license of a registered livestock dealer for wilful misrepresentation of cattle weights in violation of federal law, proof of the violation being established, in part, by admission into evidence of an audit of the dealer's books and records. Rejecting the dealer's claim that his Fifth Amendment right against self-incrimination was thereby violated, the court held, 429 F. 2d at 267:

> "Keeping in mind that petitioners' registration as a livestock dealer is a privilege granted by the Secretary of Agriculture, pursuant to the provisions of the Act, . . . and that a livestock dealer is required to keep records for examination by the officials of the agency, . . . and that the keeping of such records and their inspection, from time to time, are important and essential means in the accomplishment of the purposes of the Act, . . . the audit of petitioners' books and records by respondent Secretary was a proper procedure. Moreover, the receipt in evidence of the products of the audits and the testimony of the auditors in charge was proper and did not constitute error." [citations omitted.]

Similarly, the "non-privileged" nature of records required to be kept by ICC regulated carriers has been recognized in the face of Fifth Amendment challenge in *United States v. Webb*, 398 F. 2d 553, 556 (4th Cir. 1968). State courts have similarly recognized and applied the required records doctrine notwithstanding attack made on Fifth Amendment grounds. *See, e.g.: State Real Estate Commission v. Roberts*, 441 Pa. 159, 271 A. 2d 246 (1970); *State v. Braun*, 209 Kan. 181, 495 P. 2d 1000 (1972); *People v. Thayer*, 47 Cal. Rptr. 780, 408 P. 2d 108 (1966); *Conner v. Alderman*, 159 So. 2d 890 (Fla. App. 1964).

The required records doctrine of *Shapiro*, despite substantial criticism[4] has not been repudiated by the

4. *See, e.g.,* Meltzer, *Required Records, the McCarran Act, and the*

Supreme Court and continues to be controlling in appropriate factual situations.[5] Although the facts in the instant case do not present the classic prototype of the required records doctrine — *i.e.*, a pervasive regulatory scheme with enforcement procedures, including periodic reporting or inspection of records required to be kept thereunder — we think them close enough in principle to warrant application of the doctrine. *See, United States v. Walden*, 411 F. 2d 1109, 1114 (4th Cir. 1969).

Maryland Rule 1230, effective November 2, 1970, adopts the Code of Professional Responsibility of the American Bar Association. *Lusby v. Nethken*, 262 Md. 584, 278 A. 2d 552 (1971). The "Disciplinary Rules" contained therein represent the mandatory minimum level of conduct required of members of the Bar. *Montgomery v. State*, 15 Md. App. 7, 288 A. 2d 628 (1972). DR 9-102 (B)(3) requires that every lawyer:

> "Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

Neither the Code of Professional Responsibility nor Maryland Code (1957, 1968 Repl. Vol., 1972 Cum. Supp.) Article 10, § 44,[6] prohibiting an attorney from commingling client funds with his own monies, make provision for required reporting or periodic audit.[7] However, in the course

---

*Privilege against Self-Incrimination*, 18 U. Chi. L. Rev. 687 (1951): Note, *Required Information and the Privilege Against Self-Incrimination*, 65 Colum. L. Rev. 681 (1965); McKay, *Self-Incrimination and the New Privacy*, 1967 Supreme Court Review 193.

**5.** Shapiro continues to be cited with approval by the Supreme Court. *See, e.g.*, California v. Byers, *supra*.

**6.** "(a) If any attorney is entrusted with, or receives and accepts, or otherwise holds, deposit monies or other trust monies, of whatever kind or nature, such monies, in the absence of written instructions or court order to the contrary shall be expeditiously deposited in an account maintained as a separate account or accounts for funds belonging to others. In no event shall he commingle any such funds with his own or use any such funds for any purpose other than the purpose for which such funds were entrusted to him."

**7.** In an exhaustive "Report of the Special Committee on Evaluation of

of regulating transactions involving conveyancing of real estate, the Legislature passed Article 21, § 42, *supra* note 1, providing a limited right of audit "of the accounts maintained by such person for funds received in connection with real estate closing transactions in this State." Thus, by combination of court rule and statute, the records in the instant case are required to be kept subject to audit in the narrow circumstances outlined in Article 21, § 42.[8]

We think the ordered audit fits each of the *Shapiro* criteria enumerated above. First, the records required are, obviously, records customarily kept by lawyers, necessary to a proper accounting of monies held for others. Secondly, the records have "public aspects" making them at least analogous to public records. They detail the use of monies which the lawyer holds for others in an area properly regulated by the State. In *State Real Estate Commission v. Roberts, supra*, the Supreme Court of Pennsylvania recognized that the escrow account records of a real estate broker were required records within the meaning of *Shapiro*. Similarly, in *United States v. Silverman*, 449 F. 2d 1341, 1345 (2d Cir. 1971), the court recognized that an attorney's closing statements in contingent fee cases, required by court rule to be filed with the court, were required records, noting:

> "Appellant's fifth amendment argument is equally without merit. Records required to be kept

Disciplinary Enforcement," 95 Reports of the American Bar Association 783, 968-70 (1970), the ABA Committee officially recommended:

> "A court rule requiring (1) that all attorneys maintain the records pertaining to client funds required under the provisions of Disciplinary Rule 9-102(B)(3) for a reasonable period after final distribution of the funds has been made; and (2) that these records be audited annually."

Such a procedure has apparently been successful in England, *see* discussion in *Blackmon v. Hale*, 78 Cal. Rptr. 569, 580-82 (1969), *vacated on other grounds*, 83 Cal. Rptr. 194, 463 P. 2d 418 (1970). *See also*, Note, 42 Notre Dame Lawyer 382 (1966-67).

8. We need not reach the issue of whether either the statute or the rule, standing alone (*e.g.*, a non-lawyer disbursing funds under § 42 or a lawyer's use of client funds other than in the circumstances outlined in § 42) would warrant application of the required records doctrine, for, under the facts of this case, both were in effect on and after November 2, 1970, a time period during which the non-compliance with Article 21 § 42 was alleged and proved.

pursuant to a reasonable regulatory scheme have 'public aspects' and may be examined for evidence of criminal conduct."

Thirdly, the records are not required of an "inherently suspect class" in an area permeated with criminal violations as in *Marchetti* and *Grosso, supra.* The distinction is clearly drawn by Justice Brennan's concurring opinion in *Mackey v. United States*, 401 U. S. 667, 708-09, 91 S. Ct. 1160, 1168, 28 L. Ed. 2d 404, 430 (1971):

> "Of course, the Government may not insulate inquiries designed to produce incriminating information merely by labeling the inquiry a necessary incident of a regulatory scheme. Where the essence of a statutory scheme is to forbid a given class of activities, it may not be enforced by requiring individuals to report their violations. See Marchetti, . . . [390 U. S. 39, 88 S. Ct. 697, 19 L. Ed. 2d 889]; Haynes v. United States, 390 U. S. 85, 88, S. Ct. 722, 19 L. Ed. 2d 923 (1968); Albertson v. SACB, 382 U. S. 70, 86 S. Ct. 194, 15 L. Ed. 2d 165 (1965). *But where the statutory scheme is not designed to forbid certain acts, but only to require that they be done in a certain way, the Government may enforce its requirements by a compulsory scheme of reporting, directed at all who engage in those activities, and not on its face designed simply to elicit incriminating information.* Shapiro v. United States, . . . [335 U. S. 1, 68 S. Ct. 1375, 92 L. Ed. 1787 (1948)]; see, Albertson v. SACB, supra, at 77-80, 15 L. Ed. 2d at 170-172."
> (emphasis added.)

Article 21, § 42 clearly evinces a legislative concern that mortgages and deeds of trust be released, and the buyer and seller informed, in accordance with the provisions of § 42(a) and (b). Failure to follow the legislatively mandated procedure may subject the offending party to the audit contemplated by § 42(c). But persons failing to adhere to the dictates of § 42(a) and (b) are not "inherently suspect of

criminal activity"; they need only show, or allow the audit to show, that another proper method was employed, *e.g.,* disbursement of funds within five days as provided in Article 21, § 42 (e).

We are not unmindful of the important values embodied in the Fifth Amendment, nor of its protection to lawyers, as "first class citizens." *Spevack v. Klein, supra.* Rather, we attempt the "balancing [of] the public need on the one hand, and the individual claim to constitutional protection on the other," suggested in *California v. Byers, supra,* and find that application of the required records doctrine, in the instant case, meets the balance called for without doing violence to the rights of either.

In the circumstances of this case, we conclude that Andresen's constitutional right against compulsory self-incrimination would not be violated by causing his real estate accounts to be subjected to audit under § 42(c). The lower court's order should, however, be modified to limit the audit to those "accounts maintained . . . for funds received in connection with real estate closing transactions in this State" occurring on or after November 2, 1970, the effective date of Maryland Rule 1230. We are further of the view that the lower court's order should be modified to limit the audit, in its initial phase, to real estate conveyances involving the Potomac Woods Subdivision. In so concluding, we recognize that the scope of the audit authorized by the statute is not limited to those real estate transactions covered in the petition for audit. We, nevertheless, think it the more prudent course of action to first obtain the audit on the transactions occurring within the Subdivision and thereafter, if the Court deems it warranted, to pass a further order widening the audit to include other real estate transactions within the State in which Andresen acted as settlement attorney.

> *Order of December 19, 1972, modified in accordance with the views expressed in this opinion and as modified affirmed; costs to be paid by appellant.*