In re John B. KENNEDY, Esquire, a Member of the Bar of the Supreme Court of the State of Delaware, Respondent.

Supreme Court of Delaware.

Submitted Oct. 28, 1981.

Decided Feb. 19, 1982.

F. Alton Tybout (argued), of Tybout, Redfearn, Casarino & Pell, Wilmington, for the Censor Committee.

John B. Kennedy, pro se, and Samuel C. Stretton (argued), Philadelphia, Pa., for respondent.

Before HERRMANN, C. J., and DUFFY and McNEILLY, JJ.

DUFFY, Justice:

This proceeding involves a judicial review of Interpretive Guideline No. 2 of Disciplinary Rule 9–102 which governs the conduct of members of the Delaware Bar, *Del.C.*, Vol. 16, p. 590; Supreme Court Rule 66 relating to the Clients' Security Trust Fund; and Regulation IV(13) of the Clients' Security Trust Fund, *Del.C.*, Vol. 16, p. 632.

I

The parties to the litigation are John B. Kennedy, a Delaware lawyer (respondent), and the Censor Committee of the Supreme Court of the State of Delaware (Censor Committee). *See* Rule 62. In a proceeding before the Censor Committee, the parties stipulated as follows:

"1. John B. Kennedy at all pertinent times is a member of the Bar of the State of Delaware.

2. By letter dated November 24, 1980, David F. Anderson, Chairman of the Client's Security Trust Fund, requested Mr. Kennedy make his financial records available for a 'spot check to verify that your financial records are being maintained in accordance with the Court's guidelines.' The said letter stated that Mr. Kennedy's name has been selected 'at random.'

3. David F. Anderson, Chairman of the Client's Security Trust Fund, was until January 1, 1978, a partner in the law firm of which Mr. Crompton is a partner. Since that time he has been counsel to the firm.

4. At the time of the aforementioned November 24, 1980, letter was sent to Mr. Kennedy, the Censor Committee of the Supreme Court of Delaware was conducting several pending investigations involving Mr. Kennedy as a Respondent.

5. Arrangements were made for the examination of Mr. Kennedy's books on April 2, 1981.

6. Mr. Kennedy, by his counsel, Samuel C. Stretton, Esquire, by letter dated March 31, 1981, to David F. Anderson, Chairman of the Client's Security Trust Fund, advised Mr. Anderson that Mr. Kennedy would not make his books and records available for inspection as requested, and further advised Mr. Anderson that it was Mr. Kennedy's intent to challenge the interpretative guideline Number 2 of D.R. 9–102, the inspection requirements of Supreme Court Rule 66 and the inspection requirements of the regulations of the Client's Security Trust Fund. A copy of the March 31, 1981, letter is attached hereto and marked Exhibit A. The said letter was received by Mr. Anderson on April 3, 1981. Mr. Stretton had spoken with Mr. Anderson by telephone on March 31, 1981, and advised him orally of the aforementioned refusal of Mr. Kennedy and advised him the letter would be forthcoming. On April 2, 1981, representatives of the accounting firm of Frank A. Gunnip and Company, the C.P.A.'s retained by the trustees of the Client Security Trust Fund to make record examinations pursuant to Delaware Supreme Court Rule 66, were refused permission to examine Mr. Kennedy's books.

7. Mr. Kennedy has taken the position that the aforementioned rules and regulations requiring the inspection of his financial records violate his constitutional right of privacy and violate his attorney-client privilege. Further, Mr. Kennedy

contends among other things that the selection process for the random inspection has provided no inherent safeguards to insure integrity of the selection process.

8. Mr. Kennedy states he stands ready to produce his records for inspection at the conclusion of his legal challenges if the ultimate decision should be adverse to his contentions."

After respondent had refused to make his books and records available for inspection, as requested by the Trustees of the Clients' Security Trust Fund, the Trustees referred the dispute to the Censor Committee.*

The Censor Committee thereafter made findings of fact and announced conclusions of law, as follows:

"(1) The following constitutes the Committee's findings of fact:

The respondent and the Committee entered into a stipulation of facts that either party considered relevant to the issue. Both parties agreed that all facts stated are correct. The stipulation of facts was admitted in evidence with a letter from the respondent's attorney attached to that exhibit and identified as Exhibit 'A'. The stipulation and exhibit admitted in evidence are attached to this report as 'Attachment A'. The facts in the matter before the Committee are stated in that stipulation.

(2) The Committee determined that it is not an appropriate body to resolve the legal contentions asserted by the respondent as the reason for refusing to comply with the provisions of Delaware Supreme Court Rule 66 and the Code of Professional Responsibility DR 9–102. The Committee determined that its sole function should be to determine whether the respondent has in fact refused to comply with the rule and the Professional Code of Conduct.

(3) The following constitutes the Committee's conclusions of law:

(a) The refusal of the respondent to comply with the requirements of the Trustees of the Clients' Security Trust Fund is before this Committee pursuant to the provisions of Delaware Supreme Court Rule 66(c)(i)(10).

(b) The respondent in refusing to submit to an examination by authorized agents of the Trustees of the Clients' Security Trust Fund violated DR 9–102 and specifically Interpretative Guideline 2(d).

(c) The respondent in refusing to submit to an examination by authorized agents of the Trustees of the Clients' Security Trust Fund violated DR 1–102(A)(1) in failing to comply with Interpretative Guideline 2(d) of DR 9–102.

(d) The respondent in refusing to submit to an examination by authorized agents of the Trustees of the Clients' Security Trust Fund violated DR 1–102(A)(5).

(e) The respondent in refusing to submit to an examination by authorized agents of the Trustees of the Clients' Security Trust Fund violated DR 1–102(A)(6).

(4) The Committee recommends the imposition of discipline."

Those findings and conclusions constituted the Final Report of the Committee which was docketed with the Clerk. See Rule 64. Thereafter, the respondent filed the following Exceptions to the Final Report:

---

* Rule 66 provides in part, as follows:

"(c) Powers and Duties of Trustees.

(i) In addition to the powers granted elsewhere in this rule, the trustees shall have the following powers and duties:

. . . . .

(10) In order to determine compliance with DR 9–102 and its Guidelines: (a) To require each member of the Bar of this Court to submit to the trustees such financial and accounting data or similar information as may be prescribed from time to time by the Court; (b) to conduct selected examinations of books and records required by the Court to be kept by members of the Bar, such examinations to be conducted in accordance with the rules and regulations approved by the Court; and (c) to report to the Censor Committee any member of the Bar found to be in noncompliance with DR 9–102 or any failure by any member of the Bar to furnish required data or information."

"1. The Respondent objects to the findings of violations of DR 1–102(A)(1), DR 1–102(A)(5) and DR 1–102(A)(6) since the Respondent was never given notice of these charges in the Order to Show Cause and therefore, his constitutional right to due process has been violated; the Order to Show Cause is attached and marked Exhibit A.

2. The Respondent objects to the finding that he 'violated DR 1–102(A)(1) in failing to comply with Interpretative Guideline 2(d) of DR 9–102' in that the aforementioned Interpretative Guideline is not a Disciplinary Rule, nor is it incorporated by reference into any Disciplinary Rule.

3. The Respondent objects to the finding that he violated DR 9–102 in that there is no evidence, and the stipulation of fact does not state, the Respondent failed to maintain 'identifiable bank accounts' as required by DR 9–102(A), nor is there any evidence the Respondent failed to comply with the provisions of DR 9–102(B).

4. The Respondent objects to the finding that his conduct in refusing to produce the records was 'prejudicial to the administration of justice' in violation of DR 1–102(A)(5) and 'conduct that adversely reflects on his fitness to practice law' in violation of DR 1–102(A)(6).

5. The Respondent objects to the findings of Disciplinary Rule Violations in that the Respondent contends the sections of Supreme Court Rule 66, Interpretative Guideline No. 2 of DR 9–102 and the Regulations of the Trustee of the Clients' Security Trust Fund requiring a selected attorney to produce his financial records upon request are invalid, unenforceable, and unconstitutional under both the Federal and Delaware Constitutions and in violation of an attorney's right to due process for the following reasons:

A. The said rules violate the constitutional and common law right of privacy of both the Respondent and his clients.

B. The said rules violate the attorney-client privilege between the Respondent and his clients.

C. The said rules do not provide or establish a uniform and adequate procedure for selection of an attorney for audit and, in fact, have no ascertainable standard, but are vague and circular in their language. Failure to provide for inherent safeguards in the selection process prevents the rules from being enforced.

D. The said rules are so vaguely drafted and constructed that they are unenforceable and in violation of the Respondent's constitutional right of due process.

E. The said rules, without providing for inherent safeguards in their selection process, create the appearance of impropriety in the 'random' selection of the Respondent's records for audit and, therefore, are unenforceable. Further, the failure to provide for inherent safeguards in the selection process creates the potential for abuse and harassment and, therefore, the rules should not be enforced.

F. The aforementioned failure to provide for inherent safeguards in the selection process creates the potential for selection being done on other than an impartial and fair basis; therefore, the rules should not be enforced.

G. The random selection process, which is done without 'cause,' constitutes an illegal search under both the United States and Delaware Constitutions.

6. The Respondent objects to the recommendation of the Censor Committee of 'the imposition of discipline' since the Respondent at all pertinent times has indicated he will produce the requested records if he fails in his legal challenges to the production request. Further, the Respondent has fully cooperated with the Censor Committee. Since the Respondent is in good faith challenging the production requirements, discipline is not warranted.

WHEREFORE, the Respondent by his attorney respectfully requests this Honor-

able Court dismiss all charges against him and delete the record production requirements of Supreme Court Rule 66 Interpretative Guideline No. 2 of DR 9–102, and the Regulations of the Trustee of the Clients' Security Trust Fund."

After briefing and oral argument on the Final Report and the Exceptions, the issue was submitted to this Court for decision.

## II

This appeal focuses on the construction of and interrelationship among several Rules and Regulations that govern the conduct of Delaware attorneys: DR9–102, Interpretive Guideline No. 2 to DR9–102, Supreme Court Rule 66 which creates the Clients' Security Trust Fund, and a Regulation adopted by the Trustees who administer that Trust Fund.

On March 22, 1971, this Court adopted The Delaware Lawyers' Code of Professional Responsibility which was modeled after, and based upon, the American Bar Association Code of Professional Responsibility which had been adopted in 1969. Rule 61 specifically provides that:

"The Canons and Disciplinary Rules of The Delaware Lawyer's Code of Professional Responsibility, promulgated by order of this Court, dated March 22, 1971, together with all amendments thereto and interpretive guidelines thereafter adopted by the Court, shall govern the conduct of members of the Bar of this State and of attorneys admitted *pro hac vice.*"

Thus, the behavior of members of the Bar of this Court is governed by the Code and the Interpretive Guidelines promulgated by this Court. Rule 9–102 of the Code provides as follows:

"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in 1 or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Because of concern over perceived problems arising from the commingling of attorney and client funds, and possible misapplication of those funds, this Court, on the advice of a committee of members of the Delaware Bar, adopted on May 31, 1975 an Interpretive Guideline to DR9–102 entitled, "Interpretive Guideline No. 2—Re: Preserving Identity of Funds and Property of Client." *See* Carpenter, The Negligent Attorney Embezzler: Delaware's Solution, 61 *A.B.A.J.* 338, 339, 340 (1975). The Guideline reads in pertinent part, as follows:

"The following statements of principles are promulgated as interpretive guidelines in the application of Disciplinary Rule 9–102 of the Delaware Lawyer's Code of Professional Responsibility:

(a) As a minimum requirement, every attorney engaged in the private

practice of law in the State of Delaware (hereinafter 'Attorney') shall maintain on a current basis books and records which establish his compliance with DR 9–102, and which shall be preserved for at least 5 years following the completion of the year to which they relate, or, as to fiduciary or trust records, 5 years following the completion of that fiduciary obligation. For this purpose, the following books and records, or their equivalent, are suggested:

NONFIDUCIARY FUNDS

(1) A cash receipts journal reflecting monies received on his ... own account such as fees received and other non-trust receipts. The receipts journal should identify the source of the receipt and show the date of the receipt. Receipts should be deposited intact and the duplicate deposit slip should be sufficiently detailed to identify each item.

(2) A cash disbursements journal reflecting monies disbursed on his own account for overhead and other expenditures.

(3) A record in the form of a fees book or file of copies of billing invoices reflecting all fees charged and other billings to clients ....

(4) Bank statements, cancelled checks, and duplicate deposit slips.

(5) A reconciliation of the cash balance derived from the cash receipts and disbursement journal totals, the check book balance and the bank statement balance at least quarterly ....

.    .    .    .    .

FIDUCIARY FUNDS (Including all funds held for clients or others):

(1) A cash receipts journal (separate from the nonfiduciary funds journal) ....

(2) A disbursements journal .... All disbursements are to be made by check.

(3) A subsidiary ledger containing a separate page for each person or company for whom monies have been received in trust showing the date of the receipt and the amount, the date of the disbursement and the amount, and any unexpended balance.

(4) A monthly trial balance of the subsidiary ledger ....

(a) The total of the monthly trial balance should agree with the control figure computed by taking the beginning balance, adding the total of monies received in the trust for the month and deducting the total of monies disbursed for the month.

(b) Monies disbursed for a client which exceed monies received must be explained.

(5) A monthly reconciliation at month-end of the cash balance ....

(6) Bank statements, cancelled checks, and duplicate deposit slips.

(7) A record showing all property, specifically identified, other than cash, held in trust from time to time for clients or others.

.    .    .    .    .

(b) On or before May 31, 1975, each Attorney shall file with the Trustees of the Clients' Security Trust Fund of the Bar of Delaware (hereinafter 'Trustees') a certificate and respond to a questionnaire as follows:

(1) The certificate shall state that: 'I have read the Delaware Lawyer's Code of Professional Responsibility and have noted DR 9–102 and the guideline relating thereto. I am complying with the DR 9–102 and its guideline.'

(2) The questionnaire shall require answers to the following questions relating to the Attorney's practice and may incorporate by reference, where appropriate, a statement filed by a partner or associate of the Attorney responding:

(a) Name.

(b) 'Do you or your firm maintain a separate trust or escrow bank account for funds held in a fiduciary capacity, including your client's funds?'

(c) 'Do you or your firm record receipts and deliveries of all funds, securities, and other properties of clients coming into your possession?'

(d) List the names of all banks or other places in which you or your firm maintain accounts which an attorney or an employee of your firm may draw on and in which funds of clients or other persons not associated with your firm are placed, the title of each account, and the account number of each account. (This question relates to escrow accounts.)

(e) List the names of all banks or other places in which you or your firm maintain accounts (other than those listed in response to paragraph (d) above) connected with your practice of law which you or some member or employee of your firm has power to control, draw on, or deposit in. (This question relates to firm nonescrow accounts.)

(c) ... A similar certificate and questionnaire shall be completed and filed with the Trustees on or before May 31 of each year ... by each Attorney. ...

(d) Books of account and records of every Attorney are subject to examination by a person or firm, engaged and directed by the Trustees, for the purpose of verifying the accuracy of certificates filed by the Attorney. Such examinations shall be conducted so as to preserve the private and confidential nature of the Attorney's records insofar as is consistent with this Guideline, Supreme Court Rules, and Censor Committee Rules.

.    .    .    .    .

(f) On or before September 15 of each year, the Chairman of the Trustees of the Clients' Security Trust Fund will certify to the Clerk of the Supreme Court the name and address of any member of the Bar of this Court who

has failed to comply with the requirements set forth herein for the filing of certificates and questionnaires with the Trustees. Thereupon, a rule will issue to such member to show cause why he or she should not be suspended as a member of the Bar of the Supreme Court, pending compliance therewith."

This Guideline requires the maintenance of books and records sufficient to show compliance with DR9–102, and "suggests" a more specific list of records that an attorney should keep. The obvious purpose of the Guideline is to provide direction to an attorney as to what records should be kept but, at the same time, to permit an attorney to be flexible and innovative in his record keeping. The nature or character of the records is not material, so long as they are sufficient to show compliance with DR9–102. *See* Carpenter, *supra* at 340.

In a different but related Rule, this Court created the Clients' Security Trust Fund in 1968. *In re Member of Bar*, Del.Supr., 257 A.2d 382 (1969), appeal dismissed 396 U.S. 274, 90 S.Ct. 562, 24 L.Ed.2d 464 (1970). The purpose then was, and now is, plainly stated in the Rule,** as follows:

"(ii) The purpose of the trust fund shall be to establish, as far as practicable, the collective responsibility of the profession in respect to losses caused to the public by defalcations of members of the Bar, acting either as attorneys or as fiduciaries (except to the extent to which they are bonded, or to the extent such losses are otherwise covered)."

The Clients' Security Trust Fund is funded entirely by moneys collected from members of the Delaware Bar (and income generated by the Fund). Annual contributions to the Fund are mandatory as a condition of continuing membership in the Bar of this Court.[1] As we have said, the purpose of the

---

** The Rule was originally designated as Number 32A; it now appears as Rule 66(a)(ii).

1. This Court recently amended Rule 66(e)(iv) to increase the upper limit of the Fund from $200,000 to $500,000. The order implementing that change, effective, January 1, 1982, states in part as follows:

"(2) That the said upper limit of $200,000 was established by Rule amendment, effective January 1, 1972;

(3) That, during the intervening years, the number of members of the Delaware Bar has substantially increased; and there has been a continuous annual increase in the rate of monetary inflation;

Fund is to impose upon our Bar a collective responsibility for the dishonesty, in a professional matter, of any member. Dishonesty occurs most often when a lawyer holds funds for a client, and that problem has been a concern of the legal profession for many years. Canon 11 of the American Bar Association Canons of Professional Ethics, adopted on August 22, 1908 stated that

"The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

*See* Wise, *Legal Ethics*, p. 425 (2 ed. 1970).

That Canon is the predecessor of the modern DR9–102(A) which mandates that a client's funds "shall be deposited" in an "identifiable bank account" in which funds belonging to the lawyer shall *not* be deposited (with limited exceptions not presently applicable). Despite that long-standing, ethical rule, this Court concluded that the creation of a fund was necessary to reimburse the victims of a lawyer who had misappropriated funds belonging to his client.

This Court has since determined that the assessment made upon Delaware lawyers under Rule 66 meets constitutional standards, that the Rule is a valid exercise of the Court's power to maintain the standards required of the Bar and to uphold its reputation by the imposition of collective responsibility for the conduct of its members, and that refusal by a member of the Bar to pay the assessment is professional delinquency. As stated by Chief Justice Wolcott:

(4) That it is the responsibility of this Court and the Trustees of the Clients' Security Trust Fund to exercise reasonable judgment and to attempt to evaluate the number, nature, and size of claims which may be asserted against the Fund in the foreseeable future;

"The authority, as well as the duty, to establish the Bar and to maintain its standards exists inherently in this Court as the highest court of the State, independent of any statutory grant of authority. . . .

The justification for the existence of this power inherently in the courts is the necessity for the proper administration of justice, which can be achieved only if the procedures and practices of the courts are fair and reasonable, and the officers of the court, the lawyers, are competent and ethical. . . .

. . . The stated purpose of Rule 32A [now Rule 66] is 'to establish as far as practicable the collective responsibility of the Profession in respect to losses caused to the public. . . .'

We think this purpose falls within the scope of our inherent power. The proper administration of justice will falter if the Bar as a whole loses the confidence of the public as to legal service to which it has a maintained monopoly. . . .

. . . .

'. . . The public looks to the profession to keep its own house in order and when a lawyer embezzles his client's funds, the whole bar is blackened in the public eye. The rest of us, as well as the embezzler, are considered at fault because we have failed to police our own ranks and to prevent the defalcation. : . .'

. . . .

. . . To sum up, we hold that the promulgation of Rule 32A is a valid exercise of our inherent power to maintain the standards required of the Bar, and to uphold its reputation by the imposition of collective responsibility for the conduct of its members. Accordingly, the refusal by a member of the Bar to pay the assess-

(5) That, under all existing circumstances, the sum of $200,000. established in 1972 has become an unrealistic upper limit for the future fulfillment of the purposes of the Fund as set forth in Rule 66, and that the sum of $500,000. is now a more realistic upper limit for the said purposes."

ment required of him is professional delinquency on his part."

*In re Member of Bar*, 257 A.2d at 383–385.

The interface between the Disciplinary Rules and the Clients' Security Trust Fund procedure occurs in the record keeping and audit procedures which are at issue in this proceeding. Thus, the Interpretative Guideline, at (d), provides, in effect, that the "books of account and records of every" Delaware attorney are subject to examination for the purpose of verifying the accuracy of the annual statement filed by that attorney, pursuant to DR9–102(B), certifying that he has complied with the Disciplinary Rule (requiring him to preserve and identify the funds and properties of his clients) and the Guideline relating thereto.

Each such certificate is filed with the Trustees of the Clients' Security Trust Fund who have the responsibility of making arrangements for and directing the examination. Pursuant to the authority in Rule 66, the Trustees have adopted Regulation IV(13) as to such examination. *See Del.C.*, Vol. 16, p. 632, which states as follows:

"At the first meeting in each calendar year the Trustees shall, by a random procedure, select 10 individual members of the Bar or law firms, or a combination of both, whose books and records shall be examined solely for the purpose of verifying the accuracy of certificates filed pursuant to the Guideline. The Trustees may in any one year select more or fewer than 10 members or firms for audit, in light of the cost thereof and the resources of the Fund."

In this case, Kennedy does not dispute that his name was in fact selected "at random." But, nevertheless, he declined to make his records available for examination or audit by a certified public accountant selected by the Trustees, as required by Regulation IV(13), and in the proceeding which followed he challenged the Guideline and the inspection requirement on several grounds, which we now consider.

### III

Kennedy first argues that his financial records are not "required records" un-

der the ruling in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1947), and its progeny and, for that reason, DR9–102 and the Guideline deal with private and not public records and thus violate his right of privacy and the attorney-client privilege.

In other words, Kennedy contends that DR9–102 is directed only to the record keeping or accounting which is made directly to a client and so, he continues, the records are private in nature and do not have a "public aspect" which is necessary for application of the *Shapiro* "required records" doctrine. On that premise, Kennedy apparently finds a positive right to privacy.

In *Shapiro*, a businessman had refused to permit the Office of Price Administration to inspect his records to determine whether he was complying with certain pricing regulations. The United States Supreme Court held that the records were required to be maintained and that the defendant could not assert a Fifth Amendment privilege against self-incrimination:

"[T]he principle enunciated in the Wilson case, and reaffirmed as recently as the Davis case, is clearly applicable here: namely, that the privilege which exists as to private papers cannot be maintained in relation to 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established.'"

68 S.Ct. at 1392. Cf. *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

In *Grosso v. United States*, 390 U.S. 62, 68, 88 S.Ct. 709, 713, 19 L.Ed.2d 906 (1968), the Supreme Court developed a three-pronged test for determining whether a business record fell within the "required records doctrine":

"First, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has cus-

tomarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents."

The Court of Appeals of Maryland applied the required records doctrine described by *Grosso* and *Shapiro* to facts similar to those in this case. *Andresen v. Bar Association of Montgomery County*, 305 A.2d 845 (Md. 1973), *cert. den.*, 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973). *Andresen* involved DR 9–102 and a Maryland Statute authorizing an audit of attorneys who did not comply with statutory procedures in real estate transactions. The Court concluded that the attorneys' financial records were "required records" and that the audit of the lawyers' books and records was proper, saying:

"We think the ordered audit fits each of the *Shapiro* criteria enumerated above. First, the records required are, obviously, records customarily kept by lawyers, necessary to a proper accounting of monies held for others. Secondly, the records have 'public aspects' making them at least analogous to public records. They detail the use of monies which the lawyer holds for others in an area properly regulated by the State."

305 A.2d at 854. *See also In re Proposed Rules Relating to Grievance Procedures*, N.H.Supr., 115 N.H. 310, 341 A.2d 272 (1975).

While we agree with the statement of the law made in *Andresen* and so could, for that reason, conclude that the records here in issue are required to be maintained by the Rules adopted by this Court in its unquestioned authority to set minimum standards of conduct for members of the Bar, we need not do so because the flaw in Kennedy's argument is more basic and it is fatal.

He candidly concedes that the "required records" rule is a concept or principle which limits the right of a person to assert the privilege against self-incrimination. And the above-cited cases make that clear. Kennedy has, however, expressly declined to assert that privilege and, since he does not rely on it, there is no reason to discuss a fact situation in which the privilege may or

may not be used, or in which there is or is not any limitation on its use. In short, the rule of *Shapiro* does not apply, nor has any logical reason for its use in this case been suggested.

IV

Relying on general principles as to a right of privacy and citing *State ex rel. State Board of Examiners v. Kuhwald*, Del.Supr., 389 A.2d 1277, 1281 (1978), Kennedy also asserts that DR9–102 offends the "protection accorded to a "lawyer's office and the private nature of the attorney-client relationship." It should be noted that he does not offer any authority to support his contention that the financial records of an attorney in issue here are protected by a right of privacy.

■ In our opinion, a lawyer does not have, and surely should not expect to have, any personal or professional right to privacy as to how he has handled moneys which, by definition, belong to other persons.

■ It is well settled in Delaware that an attorney is bound by a fiduciary duty in his dealings with his client. *Melson v. Michlin*, Del.Supr., 223 A.2d 338, 344 (1966); *In re Goldstein*, Del.Supr., 85 A.2d 361, 364 (1951); *Vredenburgh v. Jones*, Del.Ch., 349 A.2d 22 (1975). As a fiduciary, "an attorney is bound to the highest degree of fidelity and good faith. Strict adherence to this rule of conduct is required by time honored, deeply rooted concepts of public policy." *Melson v. Michlin*, 223 A.2d at 344. The attorney is a "trustee for his client." *In re Goldstein*, 85 A.2d at 364. It necessarily follows that an attorney acts as a fiduciary when he deals with the funds of his client. Surely, then, it is utterly baseless for an attorney to claim that his right to privacy prohibits a reasonable scrutiny, pursuant to general standards adopted under the authority of the court which had admitted him to the practice of law, of his financial records detailing the management and use of his client's funds.

■ Even if Kennedy had a reasonable expectation of privacy in the financial rec-

ords required under DR9–102 and the Guideline, and we conclude that he does not, such a right would still be subject to reasonable governmental regulation.

The Supreme Court set the parameters of the constitutional right to privacy in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in which it said that:

> "[t]hese decisions make it clear that only personal rights that can be deemed fundamental or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), are included in this guarantee of personal privacy."

93 S.Ct. at 726.

The constitutional right of privacy is not unlimited, however, and is subject to regulation by the State if sufficient legitimate governmental interest in the legislation can be shown. *Roe v. Wade,* 93 S.Ct. at 727. If "fundamental rights" are involved, the State must show a "compelling state interest" to justify the regulation, 93 S.Ct. at 728, but in recent years the Court has not expanded the zone of privacy beyond certain well defined and limited areas. For example, in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court concluded that a person who had been charged with shoplifting could not challenge, on the basis of a right to privacy, the publication of his name and picture on a "flyer" to local businessmen listing "active shoplifters." 96 S.Ct. at 1158. In finding that the defendant's acts did not infringe on a recognized "zone of privacy" the Court stated:

> "While there is no 'right of privacy' found in any specific guarantee of the Constitution, the Court has recognized that 'zones of privacy' may be created by more specific constitutional guarantees and thereby impose limits upon government power. See *Roe v. Wade* .... Respondent's case, however, comes within none of these areas. He does not seek to suppress evidence seized in the course of an unreasonable search. See *Katz v. United States* [389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576] .... And our other 'right of privacy' cases, while defying categorical description, deal generally with substantive aspects of the Fourteenth Amendment. In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty' as described in *Palko v. Connecticut* .... The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In those areas it has been held that there are limitations on the States' power to substantively regulate conduct.

> Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be 'private,' but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner."

96 S.Ct. at 1166.

In cases involving State action requiring the maintenance and disclosure of financial and corporate records, it appears that courts have required less than a compelling state interest to validate regulations requiring the maintenance and disclosure of records. For example, courts have rejected challenges based on the right to privacy in financial records of corporations and partnerships, *Bellis v. U. S.,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974); in records relating to prescriptions for dangerous drugs, *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); in medical records required by OSHA, *General Motors v. Dir. of Nat. Institute, Etc.,* 6 Cir., 636 F.2d 163 (1980), *United States v. Westinghouse Elec. Corp.,* 3 Cir., 638 F.2d 570 (1980); in records

relating to hospital costs, *St. Michael's Convalescent v. State of Cal.*, 9 Cir., 643 F.2d 1369 (1981); in certain bank records, *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); in information subpoenaed by the Internal Revenue Service, *U. S. v. Silkman*, 8 Cir., 543 F.2d 1218 (1976), *cert. den.*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1973), *United States v. Brown*, 10 Cir., 600 F.2d 248 (1979), *cert. den.*, 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979); and in records relating to the finances of candidates for public office and government employees, *Goldtrap v. Askew*, Fla.Supr., 334 So.2d 20 (1976), *People ex rel. Recktenwald v. Janura*, Ill.Ct.App., 59 Ill. App.3d 143, 17 Ill.Dec. 129, 376 N.E.2d 22 (1978).

▆ In light of such cases we conclude that Kennedy did not have a reasonable expectation of privacy in the records in issue, that records relating to the handling of client money are not "fundamental" or "implicit in a concept of ordered liberty," and that this Court has a legitimate interest in protecting members of the public from the defalcations of any Delaware attorney. *See Law Students Civil Rights Research Council Inc. v. Wadmond*, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971). In short, an attorney has no more right of privacy in his records showing what he did with his clients' money than a taxpayer does with respect to records requested by the Internal Revenue Service, or a bank does when confronted by Federal or state bank examiners. The Guideline authorizes a minimum intrusion on the rights of an attorney and does not permit public disclosure of his records; it merely requires that the attorney make his records available for examination by a public accountant selected by the Trustees.

V

▆ We agree that any right to privacy which Kennedy may have in his financial records may be affected or limited by the attorney-client privilege, under certain circumstances. In defining the attorney-client privilege, several Delaware cases have cited with approval the language of Judge Wyzanski from the landmark case of *United States v. United Shoe Machinery Corporation*, D.Mass., 89 F.Supp. 357 (1950). *See Riggs Nat. Bank of Washington D.C. v. Zimmer*, Del.Ch., 355 A.2d 709, 713 (1976); *Texaco Inc. v. Phoenix Steel Corp.*, Del.Ch., 264 A.2d 523, 524 (1970). Judge Wyzanski defined the attorney-client privilege as follows:

> "The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the Bar of a court, or his subordinate and (b) in connection with his communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." 89 F.Supp. at 358.

The purpose of the privilege is to foster the confidence of a client and to permit him to communicate freely with his attorney, without fear, while seeking legal advice.[2] *Riggs Nat. Bank of Washington D.C.*, supra, 355

2. Wigmore described the purpose of the attorney-client privilege as follows:

> "The policy of the [attorney-client privilege has been plainly grounded since the latter part of the 1700s on subjective considerations. In order to promote freedom of consultation of legal advisers by clients, the apprehension of compelled disclosure by the legal advisers must be removed; hence the law must prohibit such disclosure except on the client's consent .... In short, all four of the elements already noted (§ 2285) as essen-

tial to such a privilege are here deemed to exist." 8 *Wigmore on Evidence* § 2291, p. 545 (McNaughton rev. 1961).

The four elements referred to (§ 2285) are as follows:

> "(1) The communications must originate in a *confidence* that they will not be disclosed.
> (2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

A.2d at 713; *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 367 (D.Del.1975). In addition, the attorney-client privilege is the privilege of the client and not the privilege of the attorney. *Riggs Nat. Bank of Washington D.C.*, supra, 335 A.2d at 713; *McCormick*, supra at § 92.

■ Applying these principles, we conclude that Kennedy's assertion of the attorney-client privilege is without merit. It is clear that the privilege was not intended to be used as a shield by an attorney to prevent scrutiny by the court of his records to determine whether or not he is meeting his fiduciary and ethical obligations to a client. The purpose of the Disciplinary Rule and Guideline is to protect a client from misappropriation of his funds by his attorney. It would be strange, indeed, if an attorney could frustrate that very purpose, by asserting the attorney-client privilege.

In summary, on the present state of affairs, in which an examination of Kennedy's books and records is sought for the purpose of determining whether he has segregated funds and kept adequate records of money which belonged to clients, we find no basis whatever for permitting him to invoke a privilege which belongs to the client.

### VI

■ Next, Kennedy argues that the random record selection and records maintenance requirements are so vague that they are unenforceable and violate his right to due process. Cf. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

There is no merit to this argument, for several reasons.

First, Kennedy, apparently has had no difficulty in understanding the Guideline because he has submitted certificates four times during the past four years stating that he has complied with it.

Second, his argument is entirely academic at this point: he has not produced his records; we do not know in what respect, if any, they fail to comply with DR9–102 and the (mandatory section of) Guideline. If Kennedy's records do not comply, then a vagueness argument may be relevant when inadequacy has been established.

Third, random selection for audit means just that:

"lacking or seeming to lack a regular plan, purpose or pattern ... 2A: Marked by an absence of bias: chosen at random ...."

*Webster's Third New International Dictionary* (1961).

And in this proceeding Kennedy does not dispute that his name was, in fact, selected at "random."

### VII

■ Next, Kennedy contends that he was denied due process when violations were found of which he had not been given notice. Clearly, an attorney is entitled to fair notice of charges against him asserted in disciplinary proceedings. *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); Matter of *Rosenbaum*, Pa.Supr., 478 Pa. 93, 385 A.2d 1329, 1331 (1978).

Kennedy argues that he should not be found in violation of DR 1–102(A)(1), DR 1–102(A)(5) and DR 1–102(A)(6), as found by the Censor Committee. And he says there are not sufficient facts in the stipulation to support findings that he violated those Disciplinary Rules.

We regard the notice argument as academic. The Committee's rule to show cause issued upon Kennedy did not identify any specific section of the Code but he did not take any exception thereto and he agreed on a stipulation of facts. All of these facts probably amount to a waiver, but it is not necessary to consider that in light of our conclusion that Kennedy should not be dis-

---

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*
(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for correct disposal of litigation."
8 *Wigmore on Evidence* § 2285, p. 527 (emphasis in original). *See also McCormick on Evidence* § 87 (2d ed. 1970).

ciplined for a good-faith submission of the production requirement issue for final decision here.

His argument as to the sufficiency of a factual stipulation is academic for the same reason. We add only that it is undisputed that he failed to produce his books and records for examination under the authority granted in the Guideline. That is the critical and, for present purposes, the determinative factual question.

In light of the challenges made by Kennedy to the Guideline and the audit procedures, it should be noted that the purpose of the audit of his books is the same as an audit of the books of any other attorney whose name is selected at random; that is, to "verify the accuracy of the certificates of compliance" which he has filed. A Delaware lawyer may not prevent verification, of what he has certified, by asserting the general rights of his clients when the purpose of verification is to assure that he has met his duty to those clients, under the governing ethical standards to which he is bound as a lawyer.

We find nothing in either the Rule or the procedure which in any way threatens the independence of the Bar nor the attorney-client relationship. On the contrary, compliance with the Rule and the Guideline will create confidence in the integrity of the Bar by stating to the public, in effect, that: a Delaware lawyer is bound by specific written standards, that those standards are published, that a lawyer certifies annually that he complied with the standards, that his books are subject to be audited on a random selection basis to verify his certificate of compliance and that, through the Clients' Security Trust Fund he annually contributes to a fund the only purpose of which is to compensate members of the public who have been victimized by a dishonest lawyer.

\*   \*   \*

Since Kennedy's records have never been provided, we cannot say that he has not complied fully with the Rule and the Guideline as he has certified. And we have no reason to believe that Kennedy's failure to produce his books and records was other than to make a good-faith challenge to the production requirements issue for final decision here. For that reason, he will not be disciplined.

\*   \*   \*

A mandate will issue ordering John B. Kennedy, as a member of the Delaware Bar, to promptly submit his books and records for examination by the public accountant or certified public accountant selected by the Trustees of the Clients' Security Trust Fund under the authority granted by this Court in Interpretive Guideline No. 2 to DR9–102.