VICE CHANCELLOR

**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: March 11, 2020
Date Decided: June 15, 2020

Ned Weinberger, Esq.
Mark Richardson, Esq.
Thomas Curry, Esq.
LABATON SUCHAROW LLP
300 Delaware Ave., Suite 1340
Wilmington, Delaware 19801

Rudolf Koch, Esq.
Kevin M. Gallagher, Esq.
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

RE: *In re Straight Path Communications Inc. Consolidated Stockholder Litigation*, C.A. No: 2017-0486-SG

Dear Counsel:

Before me is the Plaintiffs' Motion to compel. The Plaintiffs seek thirty-one (31) documents previously produced by Defendant IDT Corporation ("IDT") to the Federal Communications Commission ("FCC") in 2016 in connection with an investigation pertinent to this Action.[1] IDT agreed to produce to the Plaintiffs here all 14,000 documents produced to the FCC subject to a privilege review, and after such privilege review, IDT withheld only the thirty-one documents at issue here as

---

[1] Pls.' Reply in Further Support of their Mot. to Compel Disc. from Def. IDT Corp., D.I. 257, Ex. 36, IDT Log Entries Reflecting Communications Produced to the FCC.

attorney-client privileged. The Plaintiffs do not contend the documents were not privileged when created. They argue, however, that any privilege was waived by disclosure to a third party, the FCC, in the investigation referred to above. IDT bears the burden of proving that the documents at issue are privileged.[2] I find they have not done so here, and accordingly order production of the documents in question. I note that to the extent the Plaintiffs bear the burden to show waiver, they have done so here.

The attorney-client privilege is an exception to the broad rule that relevant documents are discoverable in litigation.[3] The privilege is meant to preserve a bedrock principle of our system of jurisprudence; that for that system to operate justly a lawyer and her client must be able to communicate freely, without the threat of disclosure of those communications, even when relevant to issues in litigation.[4]

---

[2] *Glassman v. Crossfit, Inc.*, 2012 WL 4859125, at *2 (Del. Ch. Oct. 12, 2012) (citing *Mayer v. Mayer*, 602 A.2d 68, 72 (Del. 1992)) ("[T]he party asserting a privilege bears the burden of proving that the material in question is privileged.").

[3] *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 713 (Del. Ch. 1976) ("[C]ourts have noted that the [attorney-client] privilege is an exception to the usual rules requiring full disclosure and its scope can be limited where circumstances so justify."); *Frank v. Engle*, 1998 WL 155553, at *2 (Del. Ch. Mar. 30, 1998) ("The second limitation upon Rule 26's liberal policy is the right of the responding party to protect relevant documents, if the circumstances allow the responding party to raise an affirmative defense such as attorney-client privilege . . . . A party who successfully asserts attorney-client privilege can deny the other party access to otherwise relevant documents.").

[4] *In re Kennedy*, 442 A.2d 79, 91 (Del. 1982) ("The purpose of the privilege is to foster the confidence of a client and to permit him to communicate freely with his attorney, without fear, while seeking legal advice."); *In re Fuqua Indus., Inc.*, 2002 WL 991666, at *2 (Del. Ch. May 2, 2002) (quoting *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993) ("The purpose of the attorney-client privilege is 'to encourage full and frank communication between clients and their attorneys.'").

That principle does not obtain however, where the holder of the privilege, the client, has chosen to share the communication with a third party.[5] Because that sharing vitiates the integrity of confidential attorney-client communication, it is generally held that the disclosing client has manifested an intent to waive the privilege thereby.[6] There are exceptions to this rule, however.

Both the Plaintiffs and IDT rely heavily on this Court's rationale of *Saito v. McKesson HBOC, Inc.*[7] *Saito* was an action by a stockholder to obtain books and records of McKesson Corporation ("McKesson"), under 8 *Del. C.* § 220.[8] McKesson attempted to withhold four groups of documents, one of which was documents produced by McKesson to the Securities and Exchange Commission ("SEC") in connection with an investigation regarding downward revisions of financial information.[9] Most of these documents were not disclosed to the SEC until a confidentiality agreement was signed with the SEC—McKesson asserted work

---

[5] *In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *4 (Del. Ch. July 3, 2013) ("In most instances, a party waives the attorney-client privilege by communicating privileged information to a third party.").

[6] *Baxter Int'l, Inc. v. Rhone-Poulenc Rorer, Inc.*, 2004 WL 2158051, at *4 (Del. Ch. Sept. 17, 2004) ("In order for a communication to be privileged, it must be confidential . . . . When the client makes a communication with the intention or expectation that it will be revealed to another person who is not necessary for the rendition of the legal services or communication, this element of confidentiality is lacking.").

[7] 2002 WL 31657622 (Del. Ch. Nov. 13, 2002).

[8] *Id.* at *1.

[9] *Id.* at *1–2.

product privilege as to all of the documents in the group, and attorney-client privilege as to four of them.[10]

Similar to the Plaintiffs' position here, the plaintiff in *Saito* contended that production of otherwise-protected documents to the SEC constituted a waiver of such protection.[11] The bulk of *Saito*'s analysis concerning the documents produced to the SEC regarded the work product doctrine. The Court in *Saito* held that work product privilege was not waived as to those documents disclosed under a confidentiality agreement with the SEC. The court reasoned that where the production was for a limited purpose and was secure from further disclosure outside of the purpose, via a confidentiality agreement, the rationale for the privilege survived and no general waiver resulted.[12] McKesson retained a reasonable expectation of privacy as to such documents because it "reasonably believed that its disclosures would remain confidential."[13] Importantly, *Saito* held that "[w]hen attorneys secure a confidentiality agreement before sharing their work product with the SEC, as [McKesson's] attorneys did, those attorneys can reasonably assume that the SEC would not reveal those confidential disclosures to other adversaries."[14] But, the court found, McKesson had *no* reasonable expectation of privacy as to those

---

[10] *Id.* at *2.
[11] *Id.*
[12] *Id.* at *6–7.
[13] *Id.* at *7. *Saito* referred to the disclosure as a "selective waiver." *Id*. at *11.
[14] *Id.*

4

documents that were shown to the SEC *before* the confidentiality agreement was entered. Accordingly, with respect to that subset of documents McKesson had waived work product privilege.[15]

I note that IDT in this action does *not* allege work product protection, as McKesson did in *Saito* with respect to the documents discussed above. As to documents over which McKesson claimed attorney client privilege—as IDT does here—*Saito*'s analysis focused on a single document, because the others were protected by the work product doctrine, and the court did not need to apply a privilege analysis for such documents.[16] The sole document not otherwise protected by the work product doctrine was disclosed to the SEC *prior* to the entry of a confidentiality agreement; thus McKesson had "manifested its intent for the document not to remain confidential" and consequently had waived its attorney-client privilege as to this document.[17] In other words, none of the documents at issue in *Saito* for which McKesson invoked only attorney-client privilege had been produced to the SEC under a confidentiality agreement. Accordingly, the *Saito* court did not reach the question of whether the privilege was preserved with respect to such documents, as was the case for work product.

---

[15] *Id.* at *11.
[16] *Id.* at *12.
[17] *Id.*

5

If I assume here that the *Saito* rationale applies to attorney-client communications,[18] nonetheless, I must still find that IDT has waived the protection with respect to the documents in question here. In invoking attorney client privilege, IDT has asserted that the productions to the FCC were *designated* as confidential. IDT has pointed to a trio of *Requests* for Confidential Treatment of Submissions (the "Requests") sent to the FCC that appealed to that body to withhold the productions from public inspection, specifically in reference to the Freedom of Information Act.[19] All three Requests state that "[t]he parties . . . respectfully requests that . . . the [FCC] withhold from public inspection and afford confidential treatment to attached material outlined below."[20]

To the extent that waiver of privilege could be avoided under *Saito*'s work product rationale, there is, to my mind, a significant distinction between the Requests cited by IDT and the confidentiality agreement cited by Chancellor Chandler in *Saito*. The confidentiality agreement there was executed amongst McKesson, the SEC, and the United States Attorney's Office for the Northern District of California.[21] *Saito* found that McKesson acted reasonably in "expecting its disclosures to the SEC under a confidentiality agreement would not reach the hands

---

[18] Generally, the immunity extended to work product is considered more essential to our system of justice than is the attorney-client privilege. Thus, the latter is more readily waived. *Id*. at *8–9.

[19] Def. IDT Corp.'s Opp'n to Pls.' Mot. to Compel Disc., D.I. 246, Exs. B–D.

[20] *Id.*

[21] *Saito*, 2002 WL 31657622, at *1.

6

of its other adversaries" and thus had a reasonable expectation of privacy, thwarting the production-as-waiver argument.[22] But here, I find, IDT did not have an analogous expectation of privacy because the documents were not produced to the FCC under a confidentiality agreement. Instead, IDT merely *requested* that the documents remain confidential. IDT had no non-disclosure agreements with the FCC, and the Requests cited by IDT are insufficient to show that IDT reasonably believed that the documents would not be revealed to other adversaries. In other words, IDT found it advantageous to disclose the privileged documents to a third party, the FCC, despite knowing that they could be disseminated. IDT did not have a commitment, let alone an enforceable agreement, with the FCC to keep the documents confidential. In that situation, IDT manifested its intent to waive any privilege by disclosing the documents to a third party. I assume that IDT desired that the thirty-one documents remain confidential, but such desire does not amount to the reasonable expectation required to avoid a waiver under *Saito*, which is an exception to the general rubric that outside disclosure vitiates the privilege.

IDT has also cited cases that decline to find a waiver of privilege where privileged documents were inadvertently produced.[23] However, nothing in the record indicates that IDT inadvertently produced the documents, instead IDT has

---

[22] *Id.* at *6.
[23] *TCV VI v. TradingScreen Inc.*, 2015 WL 5674874 (Del. Ch. Sept. 25, 2015); *In re Kent Cty. Adequate Pub. Facilities Ordinances Litig.*, 2008 WL 1851790 (Del. Ch. Apr. 18, 2008).

simply asserted that "[i]ts inclusion of a small number of privileged documents in its voluminous production to the FCC does not waive privilege."[24]  I find the cases cited by IDT inapposite as to whether privilege was waived by IDT's purposeful production.

Consequently, I grant the Plaintiffs' Motion to Compel regarding the thirty-one documents produced by IDT to the FCC.

To the extent the foregoing requires an order to take effect, it is SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

[24] Def. IDT Corp.'s Opp'n to Pls.' Mot. to Compel Disc., D.I. 246, at 8.